(Slip Opinion)          OCTOBER TERM, 2009          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MERCK & CO., INC., ET AL. *v.* REYNOLDS ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 08–905.   Argued November 30, 2009—Decided April 27, 2010

On November 6, 2003, respondent investors filed a securities fraud ac-
tion under §10(b) of the Securities Exchange Act of 1934, alleging
that petitioner Merck & Co. knowingly misrepresented the heart-
attack risks associated with its drug Vioxx.  A securities fraud com-
plaint is timely if filed no more than "2 years after the discovery of
the facts constituting the violation" or 5 years after the violation.  28
U. S. C. §1658(b).  The District Court dismissed the complaint as un-
timely because the plaintiffs should have been alerted to the *possibil-
ity* of Merck's misrepresentations prior to November 2001, more than
2 years before the complaint was filed, and they had failed to under-
take a reasonably diligent investigation at that time.  Among the
relevant circumstances were (1) a March 2000 "VIGOR" study com-
paring Vioxx with the painkiller naproxen and showing adverse car-
diovascular results for Vioxx, which Merck suggested might be due to
the absence of a benefit conferred by naproxen rather than a harm
caused by Vioxx (the naproxen hypothesis); (2) an FDA warning let-
ter, released to the public on September 21, 2001, saying that Merck's
Vioxx marketing with regard to the cardiovascular results was "false,
lacking in fair balance, or otherwise misleading"; and (3) pleadings
filed in products-liability actions in September and October 2001 al-
leging that Merck had concealed information about Vioxx and inten-
tionally downplayed its risks.  The Third Circuit reversed, holding
that the pre-November 2001 events did not suggest that Merck acted
with scienter, an element of a §10(b) violation, and consequently did
not commence the running of the limitations period.

*Held:*

   1. The limitations period in §1658(b)(1) begins to run once the
plaintiff actually discovered or a reasonably diligent plaintiff would

have "discover[ed] the facts constituting the violation"—whichever comes first.  In the statute of limitations context, "discovery" is often used as a term of art in connection with the "discovery rule," a doctrine that delays accrual of a cause of action until the plaintiff has "discovered" it.  The rule arose in fraud cases but has been applied by state and federal courts in other types of claims, and legislatures have sometimes codified this rule.  When "discovery" is written directly into a statute, courts have typically interpreted the word to refer not only to actual discovery, but also to the hypothetical discovery of facts a reasonably diligent plaintiff would know.  Congress intended courts to interpret the word "discovery" in §1658(b)(1) similarly.  That statute was enacted after this Court determined a governing limitations period for private §10(b) actions, *Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson*, 501 U. S. 350, concluding that such actions "must be commenced within one year *after the discovery of the facts constituting the violation . . . ,*" *id.,* at 364 (emphasis added).  Since then, Courts of Appeals deciding the matter have held that "discovery" occurs both when a plaintiff *actually* discovers the facts and when a hypothetical reasonably diligent plaintiff would have discovered them.  In 2002, Congress repeated *Lampf*'s critical language in enacting the present limitations statute.  Normally, when Congress enacts statutes, it is aware of relevant judicial precedent.  See, *e.g., Edelman* v. *Lynchburg College*, 535 U. S. 106, 116–117, and n. 13.  Given the history and precedent surrounding the use of "discovery" in the limitations context generally as well as in this provision, the reasons for making this assumption are particularly strong here.  Merck's claims are evaluated accordingly.  Pp. 8–12.

2. In determining the time at which "discovery" occurs, terms such as "inquiry notice" and "storm warnings" may be useful insofar as they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating.  But the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered "the facts constituting the violation," including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation.  Pp. 12–17.

(a) Contrary to Merck's argument, facts showing scienter are among those that "constitut[e] the violation."  Scienter is assuredly a "fact."  In a §10(b) action, it refers to "a mental state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 194, n. 12, and "constitut[es]" an important and necessary element of a §10(b) "violation."  See *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U. S. 308, 319.  Because the scienter element of §10(b) fraud cases has special heightened pleading requirements, see

Syllabus

15 U. S. C. §78u–4(b)(2), unless a §10(b) complaint sets forth facts showing that it is "at least as likely as not" that the defendant acted with the relevant intent, the claim will fail. *Tellabs, supra,* at 328 (emphasis deleted). It would frustrate the very purpose of the discovery rule codified in §1658(b)(1) if the limitations period began to run regardless of whether a plaintiff had "discover[ed]" any facts suggesting scienter. Pp. 12–14.

(b) The Court also rejects Merck's argument that, even if "discovery" requires facts related to scienter, facts that tend to show a materially false or misleading statement (or material omission) are ordinarily sufficient to show scienter. Where §10(b) is at issue, the relation of factual falsity and state of mind is more context specific. For instance, an incorrect prediction about a firm's future earnings, by itself, does not automatically show whether the speaker deliberately lied or made an innocent error. Hence, "discovery" of additional scienter-related facts may be required. The statute's inclusion of an unqualified bar on actions instituted "5 years after such violation," §1658(b)(2), should diminish Merck's fear that this requirement will give life to stale claims or subject defendants to liability for acts taken long ago. P. 14.

(c) And the Court cannot accept Merck's argument that the limitations period begins at "inquiry notice," meaning the point where the facts would lead a reasonably diligent plaintiff to investigate further, because that point is not necessarily the point at which the plaintiff would already have "discover[ed]" facts showing scienter or other "facts constituting the violation." The statute says that the plaintiff's claim accrues only after the "discovery" of those latter facts. It contains no indication that the limitations period can sometimes begin *before* "discovery" can take place. Merck also argues that determining when a hypothetical reasonably diligent plaintiff would have "discover[ed]" the necessary facts is too complicated for judges to undertake. But courts applying the traditional discovery rule have long had to ask what a reasonably diligent plaintiff would have known and done in myriad circumstances and already undertake this kind of inquiry in securities fraud cases. Pp. 14–17.

3. Prior to November 6, 2001, the plaintiffs did not discover, and Merck has not shown that a reasonably diligent plaintiff would have discovered, "the facts constituting the violation." The FDA's September 2001 warning letter shows little or nothing about the here-relevant scienter, *i.e.*, whether Merck advanced the naproxen hypothesis with fraudulent intent. The FDA itself described the hypothesis as a "possible explanation" for the VIGOR results, faulting Merck only for failing sufficiently to publicize the less favorable alternative, that Vioxx might be harmful. The products-liability complaints' general statements about Merck's state of mind show little

Syllabus

more.  Thus, neither these circumstances nor any of the other pre-November 2001 circumstances reveal "facts" indicating the relevant scienter.  Pp. 17–19.

543 F. 3d 150, affirmed.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, ALITO, and SOTOMAYOR, JJ., joined. STEVENS, J., filed an opinion concurring in part and concurring in the judgment.  SCALIA, J., filed an opinion concurring in part and concurring in the judgment, in which THOMAS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–905

MERCK & CO., INC., ET AL., PETITIONERS *v.* RICHARD
REYNOLDS ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[April 27, 2010]

JUSTICE BREYER delivered the opinion of the Court.

This case concerns the timeliness of a complaint filed in
a private securities fraud action.  The complaint was
timely if filed no more than two years after the plaintiffs
"discover[ed] the facts constituting the violation."   28
U. S. C. §1658(b)(1).  Construing this limitations statute
for the first time, we hold that a cause of action accrues (1)
when the plaintiff did in fact discover, or (2) when a rea-
sonably diligent plaintiff would have discovered, "the facts
constituting the violation"—whichever comes first.  We
also hold that the "facts constituting the violation" include
the fact of scienter, "a mental state embracing intent to
deceive, manipulate, or defraud," *Ernst & Ernst* v.
*Hochfelder*, 425 U. S. 185, 194, n. 12 (1976).  Applying this
standard, we affirm the Court of Appeals' determination
that the complaint filed here was timely.

I

The action before us involves a claim by a group of inves-
tors (the plaintiffs, respondents here) that Merck & Co.
and others (the petitioners here, hereinafter Merck) know-
ingly misrepresented the risks of heart attacks accompany-

ing the use of Merck's pain-killing drug, Vioxx (leading to economic losses when the risks later became apparent). The plaintiffs brought an action for securities fraud under §10(b) of the Securities Exchange Act of 1934. See 48 Stat. 891, as amended, 15 U. S. C. §78j(b); SEC Rule 10b–5, 17 CFR §240.10b–5(b) (2009); *Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U. S. 336, 341–342 (2005).

The applicable statute of limitations provides that a "private right of action" that, like the present action, "involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought not later than the earlier of—

"(1) 2 years after the discovery of the facts constituting the violation; or

"(2) 5 years after such violation." 28 U. S. C. §1658(b).

The complaint in this case was filed on November 6, 2003, and no one doubts that it was filed within five years of the alleged violation. Therefore, the critical date for timeliness purposes is November 6, 2001—two years before this complaint was filed. Merck claims that before this date the plaintiffs had (or should have) discovered the "facts constituting the violation." If so, by the time the plaintiffs filed their complaint, the 2-year statutory period in §1658(b)(1) had run. The plaintiffs reply that they had not, and could not have, discovered by the critical date those "facts," particularly not the facts related to scienter, and that their complaint was therefore timely.

### A

We first set out the relevant pre-November 2001 facts, as we have gleaned them from the briefs, the record, and the opinions below.

*1. 1990's.* In the mid-1990's Merck developed Vioxx. In 1999 the Food and Drug Administration (FDA) approved it for prescription use. Vioxx suppresses pain by inhibiting

the body's production of an enzyme called COX–2 (cyclooxygenase-2). COX–2 is associated with pain and inflammation. Unlike some other anti-inflammatory drugs in its class like aspirin, ibuprofen, and naproxen, Vioxx does not inhibit production of a second enzyme called COX–1 (cyclooxygenase-1). COX–1 plays a part in the functioning of the gastrointestinal tract and also in platelet aggregation (associated with blood clots). App. 50–51.

*2. March 2000.* Merck announced the results of a study, called the "VIGOR" study. *Id.*, at 291–294. The study compared Vioxx with another painkiller, naproxen. The study showed that persons taking Vioxx suffered fewer gastrointestinal side effects (as Merck had hoped). But the study also revealed that approximately 4 out of every 1,000 participants who took Vioxx suffered heart attacks, compared to only 1 per 1,000 participants who took naproxen. *Id.*, at 296, 306; see Bombardier et al., Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis, 343 New England J. Medicine 1520, 1523, 1526–1527 (2000).

Merck's press release acknowledged VIGOR's adverse cardiovascular data. But Merck said that these data were "consistent with naproxen's ability to block platelet aggregation." App. 291. Merck noted that, since "Vioxx, like all COX–2 selective medicines, does not block platelet aggregation[, it] would not be expected to have similar effects." *Ibid.* And Merck added that "safety data from all other completed and ongoing clinical trials . . . showed no indication of a difference in the incidence of thromboembolic events between Vioxx" and either a placebo or comparable drugs. *Id.*, at 293 (emphasis deleted).

This theory—that VIGOR's troubling cardiovascular findings might be due to the absence of a benefit conferred by naproxen rather than due to a harm caused by Vioxx— later became known as the "naproxen hypothesis." In advancing that hypothesis, Merck acknowledged that the

naproxen benefit "had not been observed previously." *Id.*, at 291. Journalists and stock market analysts reported all of the above—the positive gastrointestinal results, the troubling cardiovascular finding, the naproxen hypothesis, and the fact that the naproxen hypothesis was unproved. See *id.*, at 355–391, 508–557.

*3. February 2001 to August 2001.* Public debate about the naproxen hypothesis continued. In February 2001, the FDA's Arthritis Advisory Committee convened to consider Merck's request that the Vioxx label be changed to reflect VIGOR's positive gastrointestinal findings. The VIGOR cardiovascular findings were also discussed. *Id.*, at 392–395, 558–577. In May 2001, a group of plaintiffs filed a products-liability lawsuit against Merck, claiming that "Merck's own research" had demonstrated that "users of Vioxx were four times as likely to suffer heart attacks as compared to other less expensive, medications." *Id.*, at 869. In August 2001, the Journal of the American Medical Association wrote that the available data raised a "cautionary flag" and strongly urged that "a trial specifically assessing cardiovascular risk" be done. *Id.*, at 331–332; Mukherjee, Nissen, & Topol, Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors, 286 JAMA 954 (2001). At about the same time, Bloomberg News quoted a Merck scientist who claimed that Merck had "additional data" that were "very, very reassuring," and Merck issued a press release stating that it stood "behind the overall and cardiovascular safety profile . . . of Vioxx." App. 434, 120 (emphasis deleted; internal quotation marks omitted).

*4. September and October 2001.* The FDA sent Merck a warning letter released to the public on September 21, 2001. It said that, in respect to cardiovascular risks, Merck's Vioxx marketing was "false, lacking in fair balance, or otherwise misleading." *Id.*, at 339. At the same time, the FDA acknowledged that the naproxen hypothesis

was a "possible explanation" of the VIGOR results. *Id.*, at 340. But it found that Merck's "promotional campaign selectively present[ed]" that hypothesis without adequately acknowledging "another reasonable explanation," namely, "that Vioxx may have pro-thrombotic [*i.e.*, adverse cardiovascular] properties." *Ibid.* The FDA ordered Merck to send healthcare providers a corrective letter. *Id.*, at 353.

After the FDA letter was released, more products-liability lawsuits were filed. See *id.*, at 885–956. Merck's share price fell by 6.6% over several days. See *id.*, at 832. By October 1, the price rebounded. See *ibid.* On October 9, 2001, the New York Times said that Merck had reexamined its own data and "found no evidence that Vioxx increased the risk of heart attacks." App. 504. It quoted the president of Merck Research Laboratories as positing "'two possible interpretations'": "'Naproxen lowers the heart attack rate, or Vioxx raises it.'" *Ibid.* Stock analysts, while reporting the warning letter, also noted that the FDA had not denied that the naproxen hypothesis remained an unproven but possible explanation. See *id.*, at 614, 626, 628.

B

We next set forth three important events that occurred *after* the critical date.

*1. October 2003.* The Wall Street Journal published the results of a Merck-funded Vioxx study conducted at Boston's Brigham and Women's Hospital. After examining the medical records of more than 50,000 Medicare patients, researchers found that those given Vioxx for 30-to-90 days were 37% more likely to have suffered a heart attack than those given either a different painkiller or no painkiller at all. *Id.*, at 164–165. (That is to say, if patients given a different painkiller or given no painkiller at all suffered 10 heart attacks, then the same number of patients given Vioxx would suffer 13 or 14 heart attacks.)

Merck defended Vioxx and pointed to the study's limitations. *Id.*, at 165–167.

*2. September 30, 2004.* Merck withdrew Vioxx from the market. It said that a new study had found "an increased risk of confirmed cardiovascular events beginning after 18 months of continuous therapy." *Id.*, at 182 (internal quotation marks omitted). A Merck representative publicly described the results as "totally unexpected." *Id.*, at 186. Merck's shares fell by 27% the same day. *Id.*, at 185, 856.

*3. November 1, 2004.* The Wall Street Journal published an article stating that "internal Merck e-mails and marketing materials as well as interviews with outside scientists show that the company fought forcefully for years to keep safety concerns from destroying the drug's commercial prospects." *Id.,* at 189–190. The article said that an early e-mail from Merck's head of research had said that the VIGOR "results showed that the cardiovascular events 'are clearly there,'" that it was "'a shame but . . . a low incidence,'" and that it "'is mechanism based as we worried it was.'" *Id.*, at 192. It also said that Merck had given its salespeople instructions to "'DODGE'" questions about Vioxx's cardiovascular effects. *Id.*, at 193.

C

The plaintiffs filed their complaint on November 6, 2003. As subsequently amended, the complaint alleged that Merck had defrauded investors by promoting the naproxen hypothesis, knowing the hypothesis was false. It said, for example, that Merck "knew, at least as early as 1996, of the serious safety issues with Vioxx," and that a "1998 internal Merck clinical trial . . . revealed that . . . serious cardiovascular events . . . occurred six times more frequently in patients given Vioxx than in patients given a different arthritis drug or placebo." *Id.*, at 56, 58–59 (emphasis and capitalization deleted).

Merck, believing that the plaintiffs knew or should have

known the "facts constituting the violation" at least two years earlier, moved to dismiss the complaint, saying it was filed too late. The District Court granted the motion. The court held that the (March 2001) VIGOR study, the (September 2001) FDA warning letter, and Merck's (October 2001) response should have alerted the plaintiffs to a *"possibility* that Merck had knowingly misrepresented material facts" no later than October 9, 2001, thus placing the plaintiffs on "inquiry notice" to look further. *In re Merck & Co. Securities, Derivative & "ERISA" Litigation*, 483 F. Supp. 2d 407, 423 (NJ 2007) (emphasis added). Finding that the plaintiffs had failed to "show that they exercised reasonable due diligence but nevertheless were unable to discover their injuries," the court took October 9, 2001, as the date that the limitations period began to run and therefore found the complaint untimely. *Id.,* at 424.

The Court of Appeals for the Third Circuit reversed. A majority held that the pre-November 2001 events, while constituting "storm warnings," did not suggest much by way of scienter, and consequently did not put the plaintiffs on "inquiry notice," requiring them to investigate further. *In re Merck & Co. Securities, Derivative & "ERISA" Litigation*, 543 F. 3d 150, 172 (2008). A dissenting judge considered the pre-November 2001 events sufficient to start the 2-year clock running. *Id.,* at 173 (opinion of Roth, J.).

Merck sought review in this Court, pointing to disagreements among the Courts of Appeals. Compare *Theoharous* v. *Fong*, 256 F. 3d 1219, 1228 (CA11 2001) (limitations period begins to run when information puts plaintiffs on "inquiry notice" of the need for investigation), with *Shah* v. *Meeker*, 435 F. 3d 244, 249 (CA2 2006) (same; but if plaintiff *does* investigate, period runs "from the date such inquiry should have revealed the fraud" (internal quotation marks omitted)), and *New England Health Care Employees Pension Fund* v. *Ernst & Young, LLP*, 336 F. 3d 495, 501 (CA6 2003) (limitations period *always* begins to

run only when a reasonably diligent plaintiff, after being put on "inquiry notice," should have discovered facts constituting violation (internal quotation marks omitted)). We granted Merck's petition.

## II

Before turning to Merck's arguments, we consider a more basic matter. The parties and the Solicitor General agree that §1658(b)(1)'s word "discovery" refers not only to a plaintiff's *actual* discovery of certain facts, but also to the facts that a reasonably diligent plaintiff would have discovered. We agree. But because the statute's language does not make this interpretation obvious, and because we cannot answer the question presented without considering whether the parties are right about this matter, we set forth the reasons for our agreement in some detail.

We recognize that one might read the statutory words "after the discovery of the facts constituting the violation" as referring to the time a plaintiff *actually* discovered the relevant facts. But in the statute of limitations context, the word "discovery" is often used as a term of art in connection with the "discovery rule," a doctrine that delays accrual of a cause of action until the plaintiff has "discovered" it. The rule arose in fraud cases as an exception to the general limitations rule that a cause of action accrues once a plaintiff has a "complete and present cause of action," *Bay Area Laundry and Dry Cleaning Pension Trust Fund* v. *Ferbar Corp. of Cal.*, 522 U. S. 192, 201 (1997) (citing *Clark* v. *Iowa City*, 20 Wall. 583, 589 (1875); internal quotation marks omitted). This Court long ago recognized that something different was needed in the case of fraud, where a defendant's deceptive conduct may prevent a plaintiff from even *knowing* that he or she has been defrauded. Otherwise, "the law which was designed to prevent fraud" could become "the means by which it is

made successful and secure."  *Bailey* v. *Glover*, 21 Wall.
342, 349 (1875).  Accordingly, "where a plaintiff has been
injured by fraud and remains in ignorance of it without
any fault or want of diligence or care on his part, the bar
of the statute does not begin to run until the fraud is
*discovered*."  *Holmberg* v. *Armbrecht*, 327 U. S. 392, 397
(1946) (internal quotation marks omitted; emphasis
added).  And for more than a century, courts have under-
stood that "[f]raud is deemed to be discovered . . . when, in
the exercise of reasonable diligence, it could have been
discovered."  2 H. Wood, Limitation of Actions §276b(11),
p. 1402 (4th ed. 1916); see *id.,* at 1401–1403, and nn. 74–
84 (collecting cases and statutes); see, *e.g., Holmberg,
supra,* at 397; *Kirby* v. *Lake Shore & Michigan Southern
R. Co.*, 120 U. S. 130, 138 (1887) (The rule "regard[s] the
cause of action as having accrued at the time the fraud
was or should have been discovered").

More recently, both state and federal courts have ap-
plied forms of the "discovery rule" to claims other than
fraud.  See 2 C. Corman, Limitation of Actions §§11.1.2.1,
11.1.2.3, pp. 136–142, and nn. 6–13, 18–23 (1991 and 1993
Supp.) (hereinafter Corman) (collecting cases); see, *e.g.,
United States* v. *Kubrick*, 444 U. S. 111 (1979).  Legisla-
tures have codified the discovery rule in various contexts.
2 Corman §11.2, at 170–171, and nn. 1–9 (collecting stat-
utes); see, *e.g.,* 28 U. S. C. §2409a(g) (actions to quiet title
against the United States).  In doing so, legislators have
written the word "discovery" directly into the statute.  And
when they have done so, state and federal courts have
typically interpreted the word to refer not only to actual
discovery, but also to the hypothetical discovery of facts a
reasonably diligent plaintiff would know.  See, *e.g., Pea-
cock* v. *Barnes*, 142 N. C. 215, 217–220, 55 S. E. 99, 100
(1906); *Davis* v. *Hibernia Sav. & Loan Soc.*, 21 Cal. App.
444, 448, 132 P. 462, 464 (1913); *Roether* v. *National
Union Fire Ins. Co.*, 51 N. D. 634, 640–642, 200 N. W. 818,

821 (1924); *Goldenberg* v. *Bache & Co.*, 270 F. 2d 675, 681 (CA5 1959); *Mobley* v. *Hall*, 202 Mont. 227, 232, 657 P. 2d 604, 606 (1983); *Tregenza* v. *Great American Communications Co.*, 12 F. 3d 717, 721–722 (CA7 1993); *J. Geils Band Employee Benefit Plan* v. *Smith Barney Shearson, Inc.*, 76 F. 3d 1245, 1254 (CA1 1996).

Thus, treatise writers now describe "the discovery rule" as allowing a claim "to accrue when the litigant first knows *or with due diligence should know* facts that will form the basis for an action." 2 Corman §11.1.1, at 134 (emphasis added); see also *ibid.*, n. 1 (collecting cases); 37 Am. Jur. 2d, Fraud and Deceit §347, p. 354 (2001 and Supp. 2009) (noting that the various formulations of "discovery" all provide that "in addition to actual knowledge of the fraud, once a reasonably diligent party is in a position that they should have sufficient knowledge or information to have actually discovered the fraud, they are charged with discovery"); *id.*, at 354–355, and nn. 2–11 (collecting cases).

Like the parties, we believe that Congress intended courts to interpret the word "discovery" in §1658(b)(1) similarly. Before Congress enacted that statute, this Court, having found in the federal securities laws the existence of an implied private §10(b) action, determined its governing limitations period by looking to other limitations periods in the federal securities laws. *Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson*, 501 U. S. 350 (1991). Noting the existence of various formulations "differ[ing] slightly in terminology," the Court chose the language in 15 U. S. C. §78i(e), the statutory provision that governs securities price manipulation claims. 501 U. S*.,* at 364, n. 9. And in doing so, the Court said that private §10(b) actions "must be commenced within one year *after the discovery of the facts constituting the violation* and within three years after such violation." *Id.,* at 364 (emphasis added). (The Court listed among the vari-

ous formulations the one in 15 U. S. C. §77m, on which the concurrence relies. See *post*, at 2–4 (SCALIA, J., concurring in part and concurring in judgment); *Lampf, supra*, at 360, and n. 7 (quoting §77m).)

Subsequently, every Court of Appeals to decide the matter held that "discovery of the facts constituting the violation" occurs not only once a plaintiff *actually* discovers the facts, but also when a hypothetical reasonably diligent plaintiff would have discovered them. See, *e.g., Law* v. *Medco Research, Inc.*, 113 F. 3d 781, 785–786 (CA7 1997); *Dodds* v. *Cigna Securities, Inc.*, 12 F. 3d 346, 350, 353 (CA2 1993); see *In re NAHC, Inc. Securities Litigation*, 306 F. 3d 1314, 1325, n. 4 (CA3 2002) (collecting cases). Some of those courts noted that other limitations provisions in the federal securities laws explicitly provide that the period begins to run "'after the discovery of the untrue statement . . . *or after such discovery should have been made by [the] exercise of reasonable diligence*,'" whereas the formulation adopted by the Court in *Lampf* from 15 U. S. C. §78i(e) does not. *Tregenza, supra*, at 721 (quoting §77m; emphasis added in *Tregenza*); see *Lampf, supra*, at 364, n. 9. But, courts reasoned, because the term "discovery" in respect to statutes of limitations for fraud has long been understood to include discoveries a reasonably diligent plaintiff would make, the omission of an explicit provision to that effect did not matter. *Tregenza, supra*, at 721; accord, *New England Health Care,* 336 F. 3d, at 499–500.

In 2002, when Congress enacted the present limitations statute, it repeated *Lampf*'s critical language. The statute says that an action based on fraud "may be brought not later than the earlier of . . . 2 years *after the discovery of the facts constituting the violation*" (or "5 years after such violation"). §804 of the Sarbanes-Oxley Act, 116 Stat. 801, codified at 28 U. S. C. §1658(b) (emphasis added). (This statutory provision does *not* make the linguistic distinc-

tion that the concurrence finds in a *different* statute, §77m, and upon which its argument rests. Cf. 29 U. S. C. §1113(2) (statute in which Congress provided that an action be brought "three years after the earliest date on which the plaintiff had *actual knowledge* of the breach or violation" (emphasis added)).)    Not surprisingly, the Courts of Appeals unanimously have continued to interpret the word "discovery" in this statute as including not only facts a particular plaintiff knows, but also the facts any reasonably diligent plaintiff would know.  See, *e.g.,* *Staehr* v. *Hartford Financial Servs. Group, Inc.*, 547 F. 3d 406, 411 (CA2 2008); *Sudo Properties, Inc.* v. *Terrebonne Parish Consolidated Govt.*, 503 F. 3d 371, 376 (CA5 2007).

We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent.  See, *e.g.,* *Edelman* v. *Lynchburg College*, 535 U. S. 106, 116–117, and n. 13 (2002); *Commissioner* v. *Keystone Consol. Industries, Inc.*, 508 U. S. 152, 159 (1993).  Given the history and precedent surrounding the use of the word "discovery" in the limitations context generally as well as in this provision in particular, the reasons for making this assumption are particularly strong here.  We consequently hold that "discovery" as used in this statute encompasses not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known.  And we evaluate Merck's claims accordingly.

## III

We turn now to Merck's arguments in favor of holding that petitioners' claims accrued before November 6, 2001.  First, Merck argues that the statute does not require "discovery" of scienter-related "facts."  See Brief for Petitioners 19–28.  We cannot agree, however, that facts about scienter are unnecessary.

The statute says that the limitations period does not begin to run until "discovery of the *facts constituting the*

*violation.*"    28 U. S. C. §1658(b)(1) (emphasis added). Scienter is assuredly a "fact." In a §10(b) action, scienter refers to "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst*, 425 U. S., at 194, n. 12. And the "'state of a man's mind is as much a fact as the state of his digestion.'" *Postal Service Bd. of Governors* v. *Aikens*, 460 U. S. 711, 716 (1983) (quoting *Edgington* v. *Fitzmaurice*, [1885] 29 Ch. Div. 459, 483).

And this "fact" of scienter "constitut[es]" an important and necessary element of a §10(b) "violation." A plaintiff cannot recover without proving that a defendant made a material misstatement *with an intent to deceive*—not merely innocently or negligently. See *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U. S. 308, 319 (2007); *Ernst & Ernst*, *supra.* Indeed, Congress has enacted special heightened pleading requirements for the scienter element of §10(b) fraud cases. See 15 U. S. C. §78u–4(b)(2) (requiring plaintiffs to "state with particularity *facts* giving rise to a strong inference that the defendant acted with the required state of mind" (emphasis added)). As a result, unless a §10(b) plaintiff can set forth facts in the complaint showing that it is "at least as likely as" not that the defendant acted with the relevant knowledge or intent, the claim will fail. *Tellabs, supra,* at 328 (emphasis deleted). It would therefore frustrate the very purpose of the discovery rule in this provision—which, after all, specifically applies only in cases "involv[ing] a claim of fraud, deceit, manipulation, or contrivance," §1658(b)—if the limitations period began to run regardless of whether a plaintiff had discovered any facts suggesting scienter. So long as a defendant concealed for two years that he made a misstatement with an intent to deceive, the limitations period would expire before the plaintiff had actually "discover[ed]" the fraud.

We consequently hold that facts showing scienter are among those that "constitut[e] the violation." In so holding, we say nothing about other facts necessary to support

a private §10(b) action. Cf. Brief for United States as *Amicus Curiae* 12, n. 1 (suggesting that facts concerning a plaintiff's reliance, loss, and loss causation are not among those that constitute "the violation" and therefore need not be "discover[ed]" for a claim to accrue).

Second, Merck argues that, even if "discovery" requires facts related to scienter, facts that tend to show a materially false or misleading statement (or material omission) are ordinarily sufficient to show scienter as well. See Brief for Petitioners 22, 28–29. But we do not see how that is so. We recognize that certain statements are such that, to show them false is normally to show scienter as well. It is unlikely, for example, that someone would falsely say "I am not married" without being aware of the fact that his statement is false. Where §10(b) is at issue, however, the relation of factual falsity and state of mind is more context specific. An incorrect prediction about a firm's future earnings, by itself, does not automatically tell us whether the speaker deliberately lied or just made an innocent (and therefore nonactionable) error. Hence, the statute may require "discovery" of scienter-related facts beyond the facts that show a statement (or omission) to be materially false or misleading. Merck fears that this requirement will give life to stale claims or subject defendants to liability for acts taken long ago. But Congress' inclusion in the statute of an unqualified bar on actions instituted "5 years after such violation," §1658(b)(2), giving defendants total repose after five years, should diminish that fear. Cf. *Lampf*, 501 U. S., at 363 (holding comparable bar not subject to equitable tolling).

Third, Merck says that the limitations period began to run prior to November 2001 because by that point the plaintiffs were on "inquiry notice." Merck uses the term "inquiry notice" to refer to the point "at which a plaintiff possesses a quantum of information sufficiently suggestive of wrongdoing that he should conduct a further inquiry."

Brief for Petitioners 20. And some, but not all, Courts of Appeals have used the term in roughly similar ways. See, *e.g., Franze* v. *Equitable Assurance*, 296 F. 3d 1250, 1254 (CA11 2002) ("[I]nquiry notice [is] "'the term used for knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed'"). Cf. *Dodds*, 12 F. 3d, at 350 ("duty of inquiry" arises once "circumstances would suggest to an investor of ordinary intelligence the probability that she had been defrauded"); *Fujisawa Pharmaceutical Co.* v. *Kapoor*, 115 F. 3d 1332, 1335–1336 (CA7 1997) ("The facts constituting [inquiry] notice must be sufficien[t] . . . to incite the victim to investigate" and "to enable him to tie up any loose ends and complete the investigation in time to file a timely suit"); *Great Rivers Cooperative of Southeastern Iowa* v. *Farmland Industries, Inc.*, 120 F. 3d 893, 896 (CA8 1997) ("Inquiry notice exists when the victim is aware of facts that would lead a reasonable person to investigate *and* consequently acquire actual knowledge of the defendant's misrepresentations" (emphasis added)).

If the term "inquiry notice" refers to the point where the facts would lead a reasonably diligent plaintiff to investigate further, that point is not necessarily the point at which the plaintiff would already have discovered facts showing scienter or other "facts constituting the violation." But the statute says that the plaintiff's claim accrues only after the "discovery" of those latter facts. Nothing in the text suggests that the limitations period can sometimes begin *before* "discovery" can take place. Merck points out that, as we have discussed, see *supra,* at 8–9, the court-created "discovery rule" exception to ordinary statutes of limitations is not generally available to plaintiffs who fail to pursue their claims with reasonable diligence. But we are dealing here with a statute, not a court-created exception to a statute. Because the statute contains no indication that the limitations period should occur at some earlier moment before

"discovery," when a plaintiff would have *begun* investigating, we cannot accept Merck's argument.

As a fallback, Merck argues that even if the limitations period does generally begin at "discovery," it should nonetheless run from the point of "inquiry notice" in one particular situation, namely, where the actual plaintiff fails to undertake an investigation once placed on "inquiry notice." In such circumstances, Merck contends, the actual plaintiff is not diligent, and the law should not "effectively excuse a plaintiff's failure to conduct a further investigation" by placing that nondiligent plaintiff and a reasonably diligent plaintiff "in the same position." Brief for Petitioners 48.

We cannot accept this argument for essentially the same reason we reject "inquiry notice" as the standard generally: We cannot reconcile it with the statute, which simply provides that "discovery" is the event that triggers the 2-year limitations period—for all plaintiffs. Cf. *United States* v. *Mack*, 295 U. S. 480, 489 (1935) ("Laches within the term of the statute of limitations is no defense at law"). Furthermore, the statute does *not* place all plaintiffs "in the same position" no matter whether they investigate when investigation is warranted. The limitations period puts plaintiffs who fail to investigate once on "inquiry notice" at a disadvantage because it lapses two years after a reasonably diligent plaintiff would have discovered the necessary facts. A plaintiff who fails entirely to investigate or delays investigating may well not have discovered those facts by that time or, at least, may not have found sufficient facts by that time to be able to file a §10(b) complaint that satisfies the applicable heightened pleading standards. Cf. *Young* v. *Lepone*, 305 F. 3d 1, 9 (CA1 2002) ("[A] reasonably diligent investigation . . . may consume as little as a few days or as much as a few years to get to the bottom of the matter").

Merck further contends that its proposed "inquiry no-

tice" standard is superior, because determining when a hypothetical reasonably diligent plaintiff would have "discover[ed]" the necessary facts is too complicated for judges to undertake. But courts applying the traditional discovery rule have long had to ask what a reasonably diligent plaintiff would have known and done in myriad circumstances. And courts in at least five Circuits already ask this kind of question in securities fraud cases. See, *e.g.*, *Rothman* v. *Gregor*, 220 F. 3d 81, 97 (CA2 2000); *New England Health Care,* 336 F. 3d, at 501; *Young, supra,* at 1, 9–10; *Sterlin* v. *Biomune Systems*, 154 F. 3d 1191, 1201 (CA10 1998); *Marks* v. *CDW Computer Centers, Inc.*, 122 F. 3d 363, 367–368 (CA7 1997). Merck has not shown this precedent to be unworkable. We consequently find that the "discovery" of facts that put a plaintiff on "inquiry notice" does not automatically begin the running of the limitations period.

We conclude that the limitations period in §1658(b)(1) begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have "discover[ed] the facts constituting the violation"—whichever comes first. In determining the time at which "discovery" of those "facts" occurred, terms such as "inquiry notice" and "storm warnings" may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating. But the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered "the facts constituting the violation," including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation.

## IV

Finally, Merck argues that, even if all its other legal arguments fail, the record still shows that, before Novem-

ber 6, 2001, the plaintiffs had discovered or should have discovered "the facts constituting the violation." In respect to scienter Merck primarily relies upon (1) the FDA's September 2001 warning letter, which said that Merck had "'minimized'" the VIGOR study's "'potentially serious cardiovascular findings'" and (2) pleadings filed in products-liability actions in September and October 2001 alleging that Merck had "'omitted, suppressed, or concealed material facts concerning the dangers and risks associated with Vioxx'" and "*purposefully* downplayed and/or understated the serious nature of the risks associated with Vioxx." Brief for Petitioners 36–37 (quoting App. 340, 893).

The FDA's warning letter, however, shows little or nothing about the here-relevant scienter, *i.e.*, whether Merck advanced the naproxen hypothesis with fraudulent intent. See Part I–A*(4), supra.* The FDA itself described the pro-Vioxx naproxen hypothesis as a "possible explanation" for the VIGOR results, faulting Merck only for failing sufficiently to publicize the alternative less favorable to Merck, that Vioxx might be harmful. App. 340.

The products-liability complaints' statements about Merck's knowledge show little more. See Part I–A*(3), supra.* Merck does not claim that these complaints contained any specific information suggesting the fraud alleged here, *i.e.*, that Merck knew the naproxen hypothesis was false even as it promoted it. And, without providing any reason to believe that the plaintiffs had special access to information about Merck's state of mind, the complaints alleged only in general terms that Merck had concealed information about Vioxx and "purposefully downplayed and/or understated" the risks associated with Vioxx—the same charge made in the FDA warning letter. App. 893.

In our view, neither these two circumstances nor any of the other pre-November 2001 circumstances that we have set forth in Part I–A, *supra,* whether viewed separately or

Opinion of the Court

together, reveal "facts" indicating scienter. Regardless of which, if any, of the events following November 6, 2001, constituted "discovery," we need only conclude that prior to November 6, 2001, the plaintiffs did not discover, and Merck has not shown that a reasonably diligent plaintiff would have discovered, "the facts constituting the violation." In light of our interpretation of the statute, our holdings in respect to scienter, and our application of those holdings to the circumstances of this case, we must, and we do, reach that conclusion. Thus, the plaintiffs' suit is timely. We need not—and do not—pass upon the Court of Appeals' suggestion that the November 2003 Brigham and Women's study might have triggered the statute of limitations. The judgment of the Court of Appeals is

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

———

No. 08–905

———

## MERCK & CO., INC., ET AL., PETITIONERS *v.* RICHARD REYNOLDS ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[April 27, 2010]

JUSTICE STEVENS, concurring in part and concurring in the judgment.

In my opinion the Court's explanation of why the complaint was timely filed is convincing and correct. *Ante*, at 12–19. In this case there is no difference between the time when the plaintiffs actually discovered the factual basis for their claim and the time when reasonably diligent plaintiffs should have discovered those facts. For that reason, much of the discussion in Part II of the Court's opinion, see *ante*, at 8–12, is not necessary to support the Court's judgment. Until a case arises in which the difference between an actual discovery rule and a constructive discovery rule would affect the outcome, I would reserve decision on the merits of JUSTICE SCALIA's argument, *post*, at 1–7 (opinion concurring in part and concurring in judgment). With this reservation, I join the Court's excellent opinion.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–905

_____

## MERCK & CO., INC., ET AL., PETITIONERS *v.* RICHARD REYNOLDS ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

[April 27, 2010]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in part and concurring in the judgment.

Private suits under §10(b) of the Securities Exchange Act of 1934, 15 U. S. C. §78j(b), must be brought within "(1) 2 years after the discovery of the facts constituting the violation" or "(2) 5 years after such violation," whichever comes first. 28 U. S. C. §1658(b)(1). I agree with the Court that scienter is among the "facts constituting the violation" that a plaintiff must "discove[r]" for the limitations period to begin. *Ante*, at 12–14 (internal quotation marks omitted). I also agree that respondents' suit is timely, but for a reason different from the Court's: Merck has not shown that respondents actually "discover[ed]" scienter more than two years before bringing suit.

In ordinary usage, "discovery" occurs when one actually learns something new. See Webster's New International Dictionary of the English Language 745 (2d ed. 1957) (defining "discovery" as "[f]inding out or ascertaining something previously unknown or unrecognized"). As the Court notes, however, *ante*, at 8–10, in the context of statutes of limitations "discovery" has long carried an additional meaning: It also occurs when a plaintiff, exercising reasonable diligence, *should have* discovered the facts giving rise to his claim. See, *e.g.*, *Wood* v. *Carpenter*, 101 U. S. 135, 140–142 (1879); 2 H. Wood, Limitations of

Actions §276b(11)–(13), pp. 1401–1408 (4th ed. 1916); Dawson, Undiscovered Fraud and Statutes of Limitation, 31 Mich. L. Rev. 591, 619, and n. 77 (1933). Read in isolation, "discovery" in §1658(b)(1) might mean constructive discovery.

In context, however, I do not believe it can. Section 13 of the Securities Act of 1933, 48 Stat. 84, explicitly established a constructive-discovery rule for claims under §§11 and 12 of that Act:

> "No action shall be maintained to enforce any liability created under section 77k or 77*l*(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . ." 15 U. S. C. §77m.

"[D]iscovery" in §77m obviously cannot mean constructive discovery, since that would render superfluous the phrase "or after such discovery should have been made by the exercise of reasonable diligence." *Ibid.* With §77m already on the books, Congress added limitations periods in the 1934 Act, 15 U. S. C. §§78i(e), 78r(c), that did not contain similar qualifying language; instead, each established a time bar that runs from "discovery" *simpliciter*. When Congress enacted §1658(b)(1) in 2002, establishing a limitations period for private actions for "fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws," specifically including the 1933 and 1934 Acts, see 15 U. S. C. §78c(a)(47), it likewise included no constructive-discovery caveat. To interpret §1658(b)(1) as imposing a constructive-discovery standard, one must therefore assume, contrary to common sense, that the same word means two very different things in the same statutory context of limitations periods for securities-fraud actions under the 1933 and 1934 Acts.

   True, the sensible presumption that a word means the same thing when it appears more than once in the same statutory context—or even in the very same statute—is rebuttable. See *General Dynamics Land Systems, Inc.* v. *Cline*, 540 U. S. 581, 595–596 (2004). Context may make clear that in one instance the word carries one meaning, and in a second instance another. See, *e.g.*, *id.*, at 596–597. But nothing in the context of §77m or §1658(b)(1) suggests that is the case. Both provisions impose limitations periods for federal-law claims based on various false statements or omissions involving securities. The former applies to false statements or omissions in registration statements, §77k, and offers to sell securities, §77*l*(a)(2); the broad language of the latter ("claim[s] of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws") covers other "manipulative or deceptive device[s] or contrivance[s]" made "in connection with the purchase or sale" of a security in violation of Securities and Exchange Commission regulations, §78j(b), including SEC Rule 10b–5, 17 CFR §240.10b–5(b) (2009). There is good reason, moreover, for providing an actual-discovery rule for private §10(b) claims but providing (explicitly) a constructive-discovery rule for claims governed by §77m: The elements of §10(b) claims, which include scienter, are likely more difficult to discover than the elements of claims under §77k or §77*l*(a)(2), which do not, see *Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 382 (1983); *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 208–209 (1976); *In re Morgan Stanley Information Fund Securities Litigation*, 592 F. 3d 347, 359 (CA2 2010). And a constructive-discovery standard may be easier to apply to the claims covered by §77m. Determining when the plaintiff should have uncovered an untrue assertion in a registration statement or prospectus is much simpler than assessing when a plaintiff should have learned that the defendant deliberately misled him

using a deceptive device covered by §10(b).[1]

Unable to identify anything in the statutory context that warrants giving "discovery" two meanings, the Court relies on the historical treatment of "discovery" in limitations periods (particularly for fraud claims) as incorporating a constructive-discovery rule. *Ante*, at 8–10, 12. But that history proves only that "discovery" *can* carry that technical meaning, and that without §77m it would be reasonable (other things equal) to read it that way here. It does not show what "discovery" means in §1658(b)(1) *in light of* §77m's codification of a constructive-discovery rule. In my view, the meaning of "discovery" in the broader context of limitations provisions is overcome by its meaning in the more specific context of the federal securities laws.

The Court's other reason for rejecting the more natural reading of §1658(b)(1) rests on a consensus among the Courts of Appeals before the provision's enactment. *Ante*, at 11–12. In *Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson*, 501 U. S. 350 (1991), the Court notes, we explicitly adopted the terms of §78i(e)—which like §1658(b)(1) refers only to discovery with no mention of reasonable diligence—as the limitations period for the private §10(b) cause of action we created. *Id.*, at 364, and

---

[1] The Court appears to believe that §77m's distinction between actual and constructive discovery has no bearing on §1658(b)(1)'s meaning because the latter does not itself draw the same distinction. *Ante*, at 11–12. The point, however, is that both provisions use the same word ("discovery") with no contextual clue that it carries different meanings; and its use in §77m makes clear that the meaning is actual discovery.

The Court suggests that usages of the same word in other statutes are irrelevant, *ante*, at 11–12, but of course it does not believe that. Its entire argument rests on the meaning courts have ascribed to "discovery" in other limitations provisions (some enacted decades ago by state legislatures), *ante*, at 8–10. Yet while the Court considers that broader context, it provides no explanation for ignoring the more specific context of securities-fraud claims under the 1933 and 1934 Acts.

n. 9.[2]　Since every Circuit to address the issue between
*Lampf* and §1658(b)(1)'s enactment 11 years later had held
constructive discovery applicable to §10(b) claims—and
since Congress copied §78i(e)'s key text into §1658(b)(1)
with no indication it intended to adopt a contrary rule—the
Court assumes Congress meant to codify (or at least not to
disturb) that consensus. *Ante*, at 11–12.

Even assuming that Congress intended to incorporate
the Circuits' views—which requires the further unrealistic
assumption that a majority of each House knew of and
agreed with the Courts of Appeals' opinions—that would
be entirely irrelevant. Congress's collective intent (if such
a thing even exists) cannot trump the text it enacts, and in
any event we have no reliable way to ascertain that intent
apart from reading the text. See *Graham County Soil and
Water Conservation Dist.* v. *United States ex rel. Wilson*,
559 U. S. ___, ___ (2010) (SCALIA, J., concurring in part
and concurring in judgment) (slip op., at 1).

The only way in which the Circuits' pre-2002 decisions
might bear on §1658(b)(1)'s meaning is if all (or nearly all)
of the Circuits had interpreted "discovery" in §78i(e) to
mean constructive discovery. If that were true, one could
say that those decisions had established the public mean-
ing of the term in this context—whether Congress knew of
(or agreed with) that meaning or not. *Jerman* v. *Carlisle,
McNellie, Rini, Kramer & Ulrich LPA*, 559 U. S. ___, ___,
n. 1 (2010) (SCALIA, J., concurring in part and concurring

_____

[2] The Court notes that *Lampf* chose §78i(e)'s limitations period as the
time bar for §10(b) claims, even though it was aware of §77m, 501 U. S.,
at 360, and n. 7, 364, and n. 9; see *ante*, at 10–11. But I fail to see how
that provides any support for the Court's interpretation. To the con-
trary, the fact that in enacting §1658(b)(1) Congress did *not* copy
§77m's constructive-discovery proviso—but decreed instead that "dis-
covery" alone starts the clock (as it had done in §78i(e), which we
borrowed in *Lampf*)—is what makes equating §77m and §1658(b)(1) so
implausible.

in judgment) (slip op., at 2, n. 1).

But as *amici* note, that is not so. See Brief for Faculty at Law and Business Schools as *Amici Curiae* 23–29 (hereinafter Faculty Brief). *Some* circuit cases cited by the Court and *amici* can conceivably be read as interpreting the language *Lampf* adopted from §78i(e) as imposing some form of constructive discovery. See *Theoharous* v. *Fong*, 256 F. 3d 1219, 1228 (CA11 2001); *Menowitz* v. *Brown*, 991 F. 2d 36, 41 (CA2 1993) *(per curiam); Howard* v. *Haddad*, 962 F. 2d 328, 329–330 (CA4 1992); *Anixter* v. *Home-Stake Production Co.*, 947 F. 2d 897, 898–899 (CA10 1991), vacated on other grounds, 503 U. S. 978 (1992). Others, however, cannot be so construed. Two were not interpreting §78i(e) at all, but looked directly to §77m, despite *Lampf*'s explicit selection of §78i(e)'s terms. *Great Rivers Cooperative of Southeastern Iowa* v. *Farmland Industries, Inc.*, 120 F. 3d 893, 896 (CA8 1997); *Topalian* v. *Ehrman*, 954 F. 2d 1125, 1135 (CA5 1992). Another court candidly acknowledged that §78i(e)'s text—unlike §77m's—forecloses constructive discovery, but it nonetheless held that courts remain "free to apply to [§78i(e)] the judge-made doctrine of inquiry notice" as a "modest and traditional . . . exercise of judicial creativity," since "Congress could not have known when it enacted [§78i(e)] that this section would someday provide the statute of limitations for a wide range of securities frauds." *Tregenza* v. *Great American Communications Co.*, 12 F. 3d 717, 721–722 (CA7 1993) (Posner, J.).

The rest of the Circuits apparently had not decided the issue before §1658(b)(1)'s enactment. See *Betz* v. *Trainer Wortham & Co.*, 519 F. 3d 863, 874 (CA9 2008); *New England Health Care Employees Pension Fund* v. *Ernst & Young, LLP*, 336 F. 3d 495, 500–501, and n. 3 (CA6 2003); *In re NAHC, Inc. Securities Litigation*, 306 F. 3d 1314, 1325 (CA3 2002); see also *Cooperativa de Ahorro y Credito Aguada* v. *Kidder, Peabody & Co.*, 129 F. 3d 222, 224 (CA1

1997) (applying pre-*Lampf* rule under 15 U. S. C. §78aa–1). And of those that were undecided, two had cast doubt on a constructive-discovery view in dicta—of which the omniscient Congress of the Court's imagining should also have been aware. See *Berry* v. *Valence Technology, Inc.*, 175 F. 3d 699, 703–705 (CA9 1999); *Gruber* v. *Price Waterhouse*, 911 F. 2d 960, 964, n. 4 (CA3 1990).

This motley assortment of approaches comes nowhere near establishing that the word "discovery" in §78i(e) meant constructive rather than actual discovery despite §77m. Absent any textual or contextual reason to read "discovery" differently in §1658(b)(1) and §77m, I would hold that only actual discovery suffices to start the limitations period for §10(b) claims. Since Merck points to no evidence showing respondents actually discovered scienter more than two years before bringing this suit, I agree with the Court that the suit was not time barred.

Respondents suggested at oral argument, Tr. of Oral Arg. 29, and their *amici* imply, see Faculty Brief 33–34, that in fraud-on-the-market cases there is little if any difference between actual and constructive discovery because of the presumption of reliance applicable in such cases, see *Basic Inc.* v. *Levinson*, 485 U. S. 224, 247 (1988). It seems to me *Basic* has no bearing on the question discussed here. A presumption of reliance upon market-price signals is not a presumption of knowledge of all public information, much less knowledge of nonpublic information that a reasonably diligent investor would have independently uncovered. In any event, whether or not a constructive-discovery standard will in many cases yield the same result, actual discovery is what §1658(b)(1) requires to start the limitations period.