# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STRATEGIC DIVERSITY, INC., a
Massachusetts corporation and
KENNETH P. WEISS, an unmarried
man,

        *Plaintiffs-Appellants,*

v.

ALCHEMIX CORPORATION, an
Arizona corporation; ROBERT R.
HORTON, husband; CHERYL HALOTA
HORTON, wife; MEDICI ASSOCIATES,
LLC, a Delaware limited liability
company,

        *Defendants-Appellees.*

Nos. 10-15256
     10-16404

D.C. No.
2:07-cv-00929-GMS

ORDER AND
OPINION

Appeal from the United States District Court
for the District of Arizona
G. Murray Snow, District Judge, Presiding

Argued and Submitted
July 20, 2011—San Francisco, California

Filed January 20, 2012

Before: Procter Hug, Jr. and Johnnie B. Rawlinson,
Circuit Judges, and Jed S. Rakoff, Senior District Judge.*

Opinion by Judge Hug;
Concurrence by Judge Rawlinson

*The Honorable Jed S. Rakoff, Senior District Judge for the U.S. District Court for Southern New York, sitting by designation.

525

## COUNSEL

James O. Ehinger, Jennings, Strouss & Salmon, P.L.C., Phoenix, Arizona, for the appellants.

Stephen W. Tully, Gordon & Rees LLP, Phoenix, Arizona, for the appellees.

## ORDER

The Opinion filed December 2, 2011, slip op. 20613, is withdrawn. It may not be cited as precedent by or to this court or any district court of the Ninth Circuit. Appellees' petition for panel rehearing is DENIED.

## OPINION

HUG, Senior Circuit Judge:

This appeal concerns the maintenance of a suit for rescission under section 10(b) of the Securities and Exchange Act of 1934 by plaintiffs-appellants Kenneth Weiss and his wholly-owned corporation Strategic Diversity, Inc. The district court granted summary judgment to defendants-appellees Robert Horton, Alchemix Corporation, and Medici Associates

on all claims and awarded the defendants attorneys' fees. We affirm in part, reverse in part, vacate the attorneys' fee award, and remand.

## I.  Background

### A.  The Initial Investment

In April 2001, Kenneth P. Weiss met Robert Horton. Weiss expressed interest in investing in Horton's alternative fuels start-up company, Alchemix Corporation. At the direction of his accountant, Weiss set up Strategic Diversity, Inc., ("Strategic") to handle his investments. In Strategic's first venture, Weiss sought to invest $500,000 in Alchemix and requested certain collateral to secure his investment. Approximately two weeks later, the parties arrived at an agreement.

In a seven-page agreement signed on July 2, 2001, Strategic agreed to invest $500,000 in Alchemix. The agreement incorporated the following: (1) a convertible promissory note ("Note") in the amount of $500,000.00; (2) security interests in Alchemix's patents and intellectual property rights; and (3) a warrant which included a provision that ensured capitalization of the company could not exceed 40 million shares ("Warrant").

The Note was to be paid after five years at an interest rate of ten percent per year compounded monthly. Under the terms of the Note, Weiss had the option of converting the Note to 250,000 shares of stock at a price of $2 or such price as offered to other investors. Alchemix had the ability to prepay the Note after one year if three conditions were met: (1) Alchemix had to give Strategic 30 days advance written notice; (2) Alchemix had to pay a prepayment penalty of $10,000; and (3) during the 30 day notice period, Alchemix had to give Strategic the option to convert the Note into 250,000 shares of Alchemix stock at $2 per share or any lower price offered to other investors.

While the agreement did not guarantee Weiss a seat on the Board, it stated that Alchemix "shall immediately undertake its best efforts . . . to elect Weiss . . . and retain [him] in such Board position at least until such time as the [Note] . . . [has] been satisfied or converted pursuant to the terms delineated therein." Weiss obtained his seat on the Board shortly after his investment was made.

As part of the loan, Weiss also obtained secured interests in Alchemix's property in certain patents and protection in the form of anti-dilution provisions.

## B.   Alchemix Needs Further Investment

In May 2002, Alchemix needed money. To that end, Alchemix entered into negotiations with the Alchemix Funding Group ("AFG"). AFG was an investment group independent of Alchemix, but the group included members of Alchemix's Board. Horton claims that Weiss was a member of AFG, but Weiss denies this assertion.

Throughout the month, AFG and Alchemix negotiated the terms of an agreement. AFG would loan Alchemix approximately $3 million, but it required certain terms on its loan. Those terms, however, conflicted with Strategic's then-held rights. To get the loan from AFG, Alchemix (and AFG) would need Strategic to make concessions. Weiss testified that his goal was to see that Alchemix succeed, and he believed that securing this line of funding would help Alchemix. Weiss agreed to make certain concessions; however, not surprisingly, he sought to be compensated for them. He negotiated with Alchemix and AFG to find an acceptable outcome for all.

The negotiations culminated in a June 5, 2002 letter from Strategic to Alchemix. In that letter, Weiss, on behalf of Strategic, wrote that he understood Alchemix was seeking funding from AFG in the amount of three million dollars. He

indicated that he intended to be an investor in AFG and that his agreement to waive Strategic's rights was "contingent upon my investment in [AFG]." Weiss then noted that he would agree to waive Strategic's rights on certain terms. Specifically, he stood ready to waive anti-dilution provisions, increase the amount of capitalized shares, and release his security interests in Alchemix patents in exchange for a $250,000 investment in Alchemix (500,000 shares at $0.50 per share).

As part of the proposed AFG loan agreement, AFG was to initially supply $1.5 million to Alchemix. A portion of that money, $560,000, was to be paid to Strategic in order to remove Strategic's security interests in Alchemix property. Once collateral requirements were in order, AFG would supply another $1.8 million, bringing its total investment in Alchemix to $3.3 million.

## C.   Western Oil Sands

However, the AFG-Alchemix transaction never took place because in the midst of those negotiations, Horton received welcome news for Alchemix. On June 17, 2002, a Canadian company, Western Oil Sands ("Western"), indicated its interest in a potentially larger investment in Alchemix than AFG was willing to offer. Western sent a "Memorandum of Understanding" ("Western Memo") to Horton. According to the Western Memo, Western was to make an initial investment of $3 million and had the option to continue investment if certain conditions were met. The potential investment was up to $36 million.

The next day, on June 18, 2002, Horton canceled the negotiations with AFG. He faxed a copy of the Western Memo to members of the Alchemix Board, including Weiss who received the document.

Sometime after the Western proposal and the circulated Western Memo, Weiss asserts that Horton misrepresented the

nature of the Western investment. Weiss testified that he and Horton were "on the phone fairly often" and that "Bob Horton told me that they [Western] were investing $30 million and that the various concessions that I made were, from my personal point of view, contingent on and related directly to that kind of investment." Weiss also claims that he inquired as to whether there were "any adverse facts or circumstances" that would affect his decision and that Horton did not offer any comments.

Because Weiss was busy with other matters, including travel outside the country, Arthur Hagopian, executive assistant to Weiss and a corporate officer of Strategic, handled the "day-to-day discussions with Alchemix' and Horton's representative." Hagopian had one conversation with Horton regarding Weiss's resignation from the Board, but all other discussions were with Richard Armstrong, Alchemix's CFO. Horton stated that Armstrong would be the person "shifting the paper" on any such transaction.

Hagopian describes his discussions with Armstrong as a "single transaction" that would involve the "replacement" of Strategic's loan with an equity holding. Armstrong, however, testified in his deposition that he did not recall the transaction. Hagopian stated that Armstrong had opened discussions by claiming that a number of concessions were needed to "clear the way" for a "new investor." The new concessions for the Western investment included the following: prepayment of the Note; relinquishment of Weiss's Board seat; waiver of Strategic's non-dilution rights; and waiver of Strategic's right to make further loans to Alchemix. Hagopian stated that Armstrong proposed that an equivalent investment in Alchemix stock would be provided at a discounted price in exchange for these concessions. Hagopian and Armstrong negotiated the price of the stock, ultimately arriving at a "discount" price of $1 per share. Armstrong told Hagopian that the 250,000 shares would not originate from Alchemix but rather from Horton's family's holdings in Medici Associates.

In the midst of the Weiss and Horton negotiations, Western made its first $3 million investment in Alchemix, pursuant to the terms in the Western Memo.

On June 27, 2002, Strategic accepted prepayment of the Note with interest and penalties totaling $560,531. In consideration of the prepayment, Strategic (1) waived the thirty day notice, (2) waived Strategic's right to loan an additional $500,000 to Alchemix, and (3) modified the Warrant to allow capitalization of up to 45 million shares. Although the document accepting prepayment of the Note itself makes no reference to the right to purchase Alchemix shares at $1 per share, Weiss produced a sheet with wiring instructions for the payment that also includes the following statement: "Please do not transfer this payment until you send a note stating, 'Strategic Diversity and/or Kenneth P. Weiss shall have the right to purchase up to 500,000 shares of Alchemix Corp. at $1 a share directly from Robert Horton.'" Hagopian also wrote to Armstrong that if there were issues with the arrangement, then the loan repayment should not be made because "the documents were conceived and created as one package."

On July 2, 2002, Alchemix sent a check to Strategic in the amount of $560,832.00. Concurrent with the payment of the Note, Horton sent a letter to Weiss in which he agreed to sell "up to 390,000 shares of Alchemix common stock on or before July 10, 2002, that is owned by Medici or me for a sales price per share of $1.00." The next week, on July 8, 2002, Weiss sent a check to Medici in the amount of $250,000 to purchase 250,000 shares of Alchemix common stock. On July 11, 2002, Weiss, as part of the transaction, tendered his resignation as a member of the Alchemix Board.

Horton views the facts differently. Although Horton and Armstrong both testified that they cannot recall the details of the transaction, they contend that it was two separate transactions: (1) the repayment of the Note to Strategic; and (2) Weiss's subsequent purchase of stock from Medici. In Hor-

ton's view, the repayment of the Note was made, and any subsequent offer of shares was strictly because Weiss was part of AFG negotiations, a point that Weiss disputes.

By the end of July 2002, Western, pursuant to the Western Memo, had the option to invest another $5 million in Alchemix. However, it never did so. Due to a fire at its facilities, the company was "strapped for cash" and decided not to continue its investment in Alchemix. Horton testified that the news of Western forgoing its Alchemix investment was a "game changer." He notified members of the Alchemix Board, but he did not notify Weiss.

On August 5, 2002, Weiss released the security interests in certain Alchemix patents.

Weiss contends that since he left the Alchemix Board, he had not received "any updates, legally required annual reports, or any communication regarding the status of Alchemix' technology, finances and development." It was only in December 2005 that Weiss learned for the first time that Western had never made an investment of $30 million and that the Alchemix Board had resigned.

## D.  *Glenn* **Litigation**

In the summer of 2002, Horton was an individual defendant in *Glenn v. Horton*, a securities fraud action in Maricopa County Superior Court. The litigation involved securities fraud in connection with another project of Horton's called "Genesis Coals." Weiss claims that Horton failed to inform him of this information and that this was material to his 2002 decision to invest in Alchemix.

## E.  **District Court Proceedings**

Weiss filed his original complaint in federal district court on May 7, 2007, seeking rescission of the transaction. He

amended his complaint on August 29, 2008, again seeking rescission and asserting causes of action for federal securities fraud (count 1), state securities fraud (count 2), common law fraud (count 3), and negligent misrepresentation (count 5). He also brought claims for mutual mistake (count 6), failure of a condition precedent (count 7), and unjust enrichment (count 8).

On January 5, 2010, the district court granted summary judgment to defendants on all claims. The court held that Weiss's federal and state securities law claims were time barred. In the alternative, the court held that Weiss's federal and state securities claims, common law fraud, and negligent misrepresentation claims failed for a lack of showing of damages. The district court also granted summary judgment to the defendants on all remaining state law claims. The district court also awarded attorneys' fees to Horton in the approximate amount of $318,000. Weiss filed appeals on the summary judgment ruling as well as the attorneys' fee award.

## II.   Jurisdiction

We have jurisdiction pursuant to 28 U.S.C. § 1291 because this case arrives to us on a grant of motion for summary judgment.

## III.   Standards of Review

We review de novo the district court's grant of summary judgment. *Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co.*, 513 F.3d 949, 954 (9th Cir. 2008). "Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* We review de novo the district court's dismissal on statute of limitations grounds. *Johnson v. Lucent Techs. Inc.*, 653 F.3d 1000, 1005 (9th Cir. 2011).

## IV. Analysis

### A. Limitations Period on Securities Claims

[1] Federal securities fraud claims "may be brought not later than the earlier of (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658. With regard to the state claims, the relevant provision of Arizona law provides that "no civil action shall be brought . . . unless brought within two years after discovery of the fraudulent practice on which the liability is based, or after the discovery should have been made by the exercise of reasonable diligence." Ariz. Rev. Stat. § 44-2004(B).

[2] The transaction that forms the basis of the complaint occurred on July 8, 2002. Weiss claims that he did not actually discover the facts underlying his cause of action until December 2005, when he spoke with Horton, who told him that the Alchemix Board had quit and that the sizable Western investment never materialized. With respect to the alleged omission regarding the *Glenn* litigation, Weiss claims that it was not until "years after" his tenure on the Alchemix Board that he learned that Horton was a defendant in a state fraud suit. Weiss filed his complaint on May 7, 2007. The parties agree that the suit was filed within the five-year limitation. However, they disagree as to whether Weiss should have known of the claims more than two years prior to filing his complaint. If the facts conclusively demonstrate that Weiss should have discovered the facts of his claim prior to May 7, 2005, the claims are time-barred.

[3] In *Merck & Co., Inc. v. Reynolds*, the Court held that " 'discovery' as used in [28 U.S.C. § 1658] encompasses not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known." 130 S.Ct. 1784, 1796 (2010). However, the " 'discovery' of facts that put a plaintiff on 'inquiry notice' does not automatically

begin the running of the limitations period." *Id.* at 1798. "[T]erms such as 'inquiry notice' and 'storm warnings' may be useful *to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating*." *Id.* (emphasis added). The Court rejected Merck's argument that the limitations period should run when the plaintiff fails to exercise diligence and undertake an investigation once on inquiry notice. *Id.* at 1797-98. The Court held that the ultimate burden is on the defendant to demonstrate that a reasonably diligent plaintiff would have *discovered* the facts constituting the violation. *See id.* at 1799.

Here, operating without the benefit of the Supreme Court's ruling in *Merck & Co.*, the district court found that the Western Memo put Weiss on "inquiry notice," and it marked the time of the commencement of the statute of limitations at the time of inquiry notice, *i.e.*, June 2002. Accordingly, the district court found Weiss's federal and state securities claims time-barred.

**[4]** However, under *Merck & Co.*, Horton has not met his burden of showing that the claims are time barred. Even assuming that Weiss was on inquiry notice in 2002, Horton does not demonstrate how a reasonably diligent plaintiff from that point forward would have discovered the violations. "[T]he limitations period does not begin to run until the plaintiff . . . discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' . . . irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." *Id.* at 1798.

**[5]** Because the district court did not have the benefit of recent Supreme Court authority, we vacate the ruling on these grounds and remand. *See Betz v. Trainer Wortham & Co., Inc.*, 610 F.3d 1169, 1171 (9th Cir. 2010) (noting the prudence of remand in light of recent Supreme Court authority).

## B.   Federal Securities Fraud Claim

**[6]** To state a claim under § 10(b), a plaintiff must allege: (1) a material misrepresentation (or omission); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

**[7]** As a preliminary matter, we are not convinced that Horton's omission concerning his involvement in the *Glenn* litigation was material to Weiss's investment decision. "An omitted fact is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010). The standard of materiality is an objective one. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976). An incomplete statement is not sufficient if the misrepresentation is not significant. *See Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). Other than a conclusory allegation that Horton's omission was material, there is no reason to conclude that this affected the "total mix" of information available or that any reasonable investor would consider this material. Horton was the civil defendant in another securities fraud case involving a completely different company. The company was in no way related to Alchemix (except by Horton's association), and it was not connected to the instant transaction. To the extent that any federal securities claim relies on this omission, summary judgment was proper.

The central issue here is whether the district court erred when it granted summary judgment on Weiss's § 10(b) claim on the ground that he failed to produce evidence of damages. Weiss argues that he need not have shown economic loss because he sought rescission and not damages.

**[8]** Contrary to Weiss's argument, we are not convinced that a suit under section 10(b) obviates the need for proving

economic loss and loss causation. Under section 10(b), the Supreme Court has held that whether rescission or a rescissionary measure of damages is available is "an unsettled one." *Randall v. Loftsgaarden*, 478 U.S. 647, 661 (1986). The statutory framework surrounding § 10(b)'s requirements is hard to square with Weiss's argument that one seeking rescission need not demonstrate loss causation. *See* 15 U.S.C. § 78u-4(b)(4) (requiring loss causation); 15 U.S.C. § 78bb(a) (prohibiting a plaintiff's recovery "in excess of his actual damages on account of the act complained of"); *see also Ryan v. Foster & Marshall, Inc.*, 556 F.2d 460, 464 (9th Cir. 1977) ("Actual damages mean some form of economic loss."). At a minimum, these statutory requirements demonstrate that a § 10(b) plaintiff must present a showing of economic loss to warrant rescission. Even in *Holdsworth v. Strong*, the one case cited by Weiss on this point, the court held that it was "not engaging in the process merely to vindicate a principle" and that "the plaintiff must establish his injury" and "show that he is injured and aggrieved in order to move the court to grant rescission." 545 F.2d 687, 697 (10th Cir. 1976). Thus, rescission does not alleviate the burden of producing evidence of economic loss.

**[9]** Prior to addressing Weiss's evidence of economic loss, we must determine whether rescission is warranted. Although rescission is a flexible remedy in equity, true rescission in this case is not entirely feasible. "Rescission reverses the fraudulent transaction and returns the parties to the position they occupied prior to the fraud." *Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1031 (9th Cir. 1999). "Under true rescission, the plaintiff returns to the defendant the subject of the transaction, plus any other benefit received under the contract, and the defendant returns to the plaintiff the consideration furnished plus interest." *Id.* Although Weiss stands ready to tender the 250,000 shares of Alchemix for the consideration he offered ($250,000), the passage of time has rendered the complete restoration of the parties to the *status quo ante* difficult if not impossible. The Note has long since

expired, coming due in July 2006. We doubt that Weiss's demand for his seat on the Alchemix Board is even possible when there does not appear at present to be an existing board. In addition, true rescission would also involve the unfurling of security interests that are currently held as collateral on other debts. Thus, we conclude that true rescission is neither feasible nor practical.

**[10]** Yet even though true rescission is not warranted, the district court had the discretion to consider an approach under a rescissionary measure of damages. "If true rescission is no longer possible . . . , the court may order its monetary equivalent." *Id.* It is within the discretion of a district judge in "appropriate circumstances" to apply a rescissionary measure of damages. *Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir. 1975). "This remedy entitles the plaintiff to the return of the consideration paid less any value received on the investment." *Ambassador Hotel Co.*, 189 F.3d at 1031. "There are two standard measures of damages in securities law." *Jordan v. Duff & Phelps Inc.*, 815 F.2d 429, 441 (7th Cir. 1987) (citing *Randall*, and *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 154-55 (1972)). The generally employed "out-of-pocket" or "market" measure is the difference between the fair value of what was received and the fair value of what one would have received had there been no fraudulent conduct. *Affiliated Ute Citizens*, 406 U.S. at 155. By contrast, rescissionary damages are to be measured so as to result in the substantial equivalent of rescission. *Loftsgaarden*, 478 U.S. at 656. One court effectively distinguished the two measures of damages in the following manner:

> When comparing out-of-pocket and rescissory damages, the fundamental distinctions are these: (1) out-of-pocket damages accept the transaction as completed, whereas rescissory damages attempt to undo it; and (2) out-of-pocket damages are measured by reference to the value of the property *on the date of the transaction*, while rescissory damages, in order

to approximate the undoing of the transaction, take account of the value of the property, and any income produced by it, *after the date of the transaction*.

*Standard Chtd. PLC v. Price Waterhouse*, 190 Ariz. 6, 35 (Ct. App. 1996) (emphasis in original); *see also Jordan*, 815 F.2d at 442 (noting the rescissionary measure "often value[s] the transaction as it turned out"). For the victim of fraudulent inducement, the economic loss in a rescissionary approach exists in the present retention of a depressed investment minus any benefits received in the retention of the investment, *e.g.*, dividends, rents, profits. Here, the district court did not consider whether the rescissionary measure of damages was appropriate. Applying an out-of-pocket measure, it found no evidence of damages and rejected Weiss's claim.

The specific question with respect to rescissionary damages will be what monetary equivalent is necessary to return Weiss to the *status quo ante*. Unlike true rescission, Weiss need not tender his shares; however, any rescissionary damage award should be offset by the value of the stock as well as any other benefits incurred after the transaction.[1] Also, to place Weiss in the true *status quo ante*, Weiss's damage award should be offset by the received benefit of the interest and prepayment penalty paid by Alchemix.

In addition, we note that Weiss's rescissionary approach does not relieve him of demonstrating loss causation. *See* 15 U.S.C. § 78bb (limiting recovery to damages "on account of the act complained of"). The misrepresentation here is that Horton claimed that a decision to invest $36 million had been

---

[1]We decline to assess the value of the stock at present. If necessary, the value should be assessed on the date of judgment. *See Nelson v. Serwold*, 576 F.2d 1332, 1339 (9th Cir. 1978) ("To adhere to the model of rescission the monetary equivalent should be determined as of the date the purchaser was under a present duty to return the stock, viz. the day of judgment." (quoting *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1342 (9th Cir. 1976) (Sneed, J., concurring))).

made. To establish causation, Weiss must demonstrate that had he known of the truth, Weiss would not have taken the action he did *i.e.*, relinquishing the Note to purchase Alchemix stock. This is a question of fact. The finder of fact will determine whether Weiss would have acted or not. Weiss faces challenges in light of the evidence that he stood ready to make the same concessions and purchase the same if not more Alchemix stock on the basis of an AFG investment of only $3 million. On the other hand, Horton testified that the loss of the substantial investment from Western was a "game changer," suggesting that a reasonable person might have behaved differently had he known that only a $3 million investment was being made. In any event, Weiss must carry his burden on causation.

**[11]** Thus, we remand for consideration of the claim under a rescissionary measure of damages and loss causation.

## C.  State Securities Fraud

As in his federal securities claim, Weiss argues that the district court erred in dismissing his securities fraud claim under Ariz. Rev. Stat. § 44-1991 because Arizona securities law does not require a showing of damages in a rescission suit. Unlike federal law, rescission under Arizona securities law does not require the existence of damages.

**[12]** Under section 44-1991(A)(2) of the Arizona Revised Statutes, a plaintiff need not demonstrate the existence of damages. *See Aaron v. Fromkin*, 196 Ariz. 224, 228 (Ct. App. 2000). "[E]stablishing statutory securities fraud requires only that a misrepresentation of material fact was made in the sale of securities." *Id.* (citing *State v. Superior Court of Maricopa Cnty.*, 123 Ariz. 324, 331 (1979)). Thus, because the district court erroneously dismissed Weiss's securities fraud claim for lack of damages, we remand this claim to the district court.[2]

---

[2]With respect to loss causation in a suit for rescissionary damages, Arizona law directs the court to consider "equitable considerations" to deter-

### D. Common Law Fraud & Negligent Misrepresentation

Weiss claims that the district court also erred in granting summary judgment on his common law fraud claim for lack of damages. Citing *Lehnhardt v. City of Phoenix*, 105 Ariz. 142, 144 (1969), Weiss argues that his claims for common law fraud and negligent misrepresentation do not require a showing of damages. We disagree and thus affirm the district court's ruling.

**[13]** Weiss reads *Lehnhardt* too broadly. *Lehnhardt* dealt with *innocent* misrepresentation, not fraud. It held that "a transaction induced by the material though innocent misrepresentation of a party is voidable against that party." *Id.* In other words, one may seek to rescind on the basis of an innocent misrepresentation, and proof of all the "nine elements of actionable fraud" is not essential.**3** Assuming *arguendo* that Weiss's claim was for innocent misrepresentation, it does not necessarily follow that damages are not required. As other courts have recognized, the element required in a common law fraud action that is not required in an innocent misrepresentation claim is the speaker's knowledge of the falsity. *See, e.g., Lundy v. Airtouch Communs., Inc.*, 81 F. Supp. 2d 962, 968 (D. Ariz. 1999). In contrast, "if the party seeking [rescission] asserts only fraudulent misrepresentation . . . then proof of all nine of the elements of actionable fraud appears to be required . . . ." *Id.* Given that common law fraud pertains to

mine whether loss causation is required. *See Grand v. Nacchio*, 214 Ariz. 9, 28 (Ct. App. 2006). We leave that determination to the district court on remand.

**3**The elements of common law fraud under Arizona law are: "(1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) his consequent and proximate injury." *Staheli v. Kauffman*, 122 Ariz. 380, 383 (1979) (internal quotations omitted).

fraudulent conduct, we conclude that damages are a required element of the claim.

In addition, Weiss claims that the district court erred in dismissing his negligent misrepresentation claim for a lack of damages. His argument is without merit. "[A] cause of action for negligent misrepresentation includes damage as an element." *Fromkin*, 196 Ariz. at 229.

**[14]** Not only do the above claims require a showing of damages, Arizona law requires an *out-of-pocket*, not rescissionary, measure of damages with respect to these claims. *See Standard Chartered PLC*, 190 Ariz. at 35 (trial court did not err in granting partial summary judgment limiting damages to an out-of-pocket measure). As Weiss failed to present evidence of out-of-pocket damages, summary judgment on these claims was proper.

## E. Mutual Mistake

Under Arizona law, "[m]utual mistake of fact is an accepted basis for rescission." *Renner v. Kehl*, 150 Ariz. 94, 96 (1986). "[A] contract may be rescinded when there is a mutual mistake of material fact which constitutes 'an essential part and condition of the contract.' " *Id.* at 97. "However, the mistake must not be one on which the party seeking relief bears the risk under the rules stated in § 154(b) of the Restatement." *Nelson v. Rice*, 198 Ariz. 563, 566 (Ct. App. 2000). "The most obvious case of allocation of the risk of a mistake is one in which the parties themselves provide for it by their agreement." Restatement (Second) of Contracts, § 154, cmt. b.

**[15]** Here, Weiss argues that an essential part of the agreement to surrender the Note for an equity investment was a mutual understanding that Western's decision to invest a total of $36 million in Alchemix had been made. Looking to his 2001 and 2002 agreements that accompanied the investment

in Alchemix and purchase of stock, both agreements appear to allocate the risk of mistake on Weiss. Thus, summary judgment on Weiss's claim of mutual mistake was proper because Weiss bore the risk of any mistake.

## F.   Failure of a Condition Precedent

**[16]** The district court held that failure of a condition precedent was not a recognized cause of action. The district court did not err in its conclusion in that Arizona law employs the failure of a condition precedent as a defense to contract formation. *See, e.g., Watts v. Hogan*, 111 Ariz. 536, 538 (1975). Weiss fails to show how Arizona law considers this an independent ground for relief. Accordingly, we affirm the district court's grant of summary judgment on this claim.

## G.   Equitable Restitution/Unjust Enrichment

**[17]** Weiss claims that the district court erroneously dismissed his equitable restitution and unjust enrichment claims. Here as well, Weiss fails to cite any relevant Arizona law on this point. Furthermore, he fails to adequately brief the point in his opening brief. *See United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992) (matters on appeal that are not specifically and distinctly argued in appellant's opening brief are not considered). Accordingly, we conclude the district court did not err in dismissing these claims.

## H.   Attorneys' Fees

Because we find that remand is appropriate on some of the claims above, we vacate the award of attorneys' fees and dismiss the appeal of this award as moot.

## V.   Conclusion

We hold that a plaintiff suing under section 10(b) seeking rescission must demonstrate economic loss. The plaintiff must

also demonstrate that the misrepresentation or fraudulent conduct caused the loss. In the instant case, we find that the record reveals that rescission is not feasible. Yet employing a rescissionary measure of damages, Weiss may be able to convince the finder of fact that he is entitled to relief. On that basis, we reverse the district court's grant of summary judgment on Weiss's federal and state securities claims (counts one and two) and remand for consideration under a rescissionary measure of damages. With respect to the statute of limitations issue, we remand for consideration in light of *Merck & Co.*, 130 S. Ct. 1784. We affirm the district court's judgment on Weiss's state law claims of common law fraud (count three), negligent misrepresentation (count five), mutual mistake (count six), failure of a condition precedent (count seven), and unjust enrichment (count eight). We vacate the district court's attorneys' fee award and dismiss the appeal of this award as moot.

Each party shall bear their own costs.

**AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, DISMISSED IN PART AND REMANDED.**

---

RAWLINSON, Circuit Judge, concurring in part:

I join the majority opinion's conclusion that this case should be remanded to allow the district court to apply *Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010) to the statute of limitations determination. I also agree that the remand requires vacatur of the attorneys' fee award. Finally, I concur in the affirmance of the distirct court's rulings on Kenneth Weiss's and Strategic Diversity's state law claims of common law fraud, negligent misrepresentation, mutual mistake, failure of a condition precedent and unjust enrichment.

However, I expressly decline to join the majority's analysis concluding in its holding that "a rescissionary measure of damages is available to Weiss." *Majority Opinion*, pp. 540-543. Weiss and Strategic Diversity never sought rescissionary damages. In fact, they expressly represented that they "were not seeking recovery of damages based on a decline in the value, or misrepresentation regarding the value, of the stock purchased. . . ." Opening Brief of Plaintiffs-Appellants, p. 38. "[T]he only remedy sought by [Strategic Diversity and Weiss] was rescission of the stock purchase . . ." *Id. See also* Plaintiffs' Response to Defendants' Motion for Summary Judgment And/Or Partial Summary Judgment In The Alternative, p. 12 (Dist. Ct. Docket #135) ("The *only* remedy that Weiss seeks in this action is rescission of the stock purchase and reinstatement of the Note. . . ." (emphasis added).

We are not in the business of raising arguments on behalf of the parties, nor should we be. *See Comite De Jornaleros De Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 948 n.6 (9th Cir. 2011) ("We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim.") (citation and internal quotation marks omitted). Such issues are waived. *See Seven Words LLC v. Network Solutions*, 260 F.3d 1089, 1097 (9th Cir. 2001). In sum, I would decline to raise and decide this issue that was waived in the district court.

For the same reason, I do not join the majority's discussion of Weiss's and Strategic Diversity's claim for securities fraud under Arizona law. Regardless of whether Arizona law requires a showing of damages in a rescission action, the fact remains that Weiss and Strategic Diversity never sought "a measure of rescissionary damages." As with the federal securities claim, they sought rescission only. *See* Opening Brief, p. 38. Moreover, Weiss and Strategic Diversity mischaracterize the district court's holding. The district court focused on the distinction between damages and injury. *See* District Court Order, p. 13. The district court acknowledged that under Ari-

zona law, a plaintiff may rescind a securities transaction despite the absence of money damages. *See id.* The district court went to explain that the plaintiff must nevertheless "demonstrate a cognizable injury" before rescission is warranted. *Id.*; *see also Grand v. Nacchio*, 217 P.3d 1203, 1205 (Ariz. Ct. App. 2009) (noting that a purchaser who is "injured" by a securities violation may seek rescission). The district court's ruling was entirely consistent with Arizona law.

Because I would remand solely for the district court to apply the Supreme Court's ruling in *Merck*, I concur in the remand only for that purpose and to reconsider the award of attorneys' fees. I would otherwise affirm the district court's ruling in its entirety.