[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-14745
_____

D.C. Docket No. 1:09-cv-02423-KOB

UNITED STATES,

Plaintiff-Appellant,

versus

JAMES STRICKER, et al.,

Defendants-Appellees.

_____

Appeals from the United States District Court
for the Northern District of Alabama
_____

(July 26, 2013)

Before JORDAN and HILL, Circuit Judges, and HOOD,[*] District Judge.

PER CURIAM:

_____

[*] The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

The government appeals the district court's dismissal of its action under the Medicare Secondary Payer Act, 42 U.S.C. § 1395y, as untimely. Having reviewed the record, and with the benefit of oral argument, we affirm.

## I

Through Medicare, the United States government supplies medical insurance for persons who are at least 65 years old, disabled, or afflicted by end-stage kidney disease. At times, another person or entity is responsible for the payment of the Medicare beneficiary's medical bills—for example, a tortfeasor who caused the beneficiary's injuries—yet refuses to swiftly pay those bills. When that happens, the Medicare Secondary Payer Act ("MSPA"), 42 U.S.C. § 1395y,[1] allows the government to pay the beneficiary's medical bills and then seek recovery from the party ultimately responsible.

For decades, from its chemical plant in Anniston, Alabama, the Monsanto Company and its predecessors—including Pharmacia Corporation and Solutia, Incorporated—produced polychlorinated biphenyls ("PCBs"), which are toxic pollutants linked to cancer and birth defects. *See* Memorandum Opinion at 2 [D.E. 109]. In 1996, thousands of individuals sued Monsanto, Pharmacia, and Solutia (collectively "the PCB producers") in state and federal courts in Alabama for

---

[1] Unless otherwise noted, all references to the statute are to the 2004 version, which is the same version used by the district court.

2

injuries caused by PCBs. *See, e.g., Abernathy v. Monsanto Co.*, Case No. CV-01-832 (Ala. Cir. Ct.); *Tolbert v. Monsanto Co.*, Case No. CV-01-C-1407-S (N.D. Ala.). Eventually, the parties reached a settlement, whereby the PCB producers would pay $300 million to the plaintiffs in return for their release of liability. More than six years after the PCB producers transferred $275 million to the PCB plaintiffs' lawyers pursuant to the settlement, but before that money was distributed to the PCB plaintiffs, the government filed suit under the MSPA against the PCB producers, the PCB plaintiffs' lawyers, and the insurance companies which furnished liability insurance to the PCB producers, seeking to recoup Medicare payments that it had made on behalf of 907 PCB plaintiffs.

As relevant here, the Federal Claims Collection Act provides that when an action is "founded upon [a] contract," the government must sue within six years of the accrual of the cause of action. *See* 28 U.S.C. § 2415(a). For actions "founded upon a tort," the government must file suit within three years of accrual. *See* 28 U.S.C. § 2415(b). The defendants moved to dismiss the government's MSPA complaint, arguing that because the underlying cause of action related to a toxic tort claim, the three-year statute of limitations under § 2415(b) applied to bar the government's action as untimely. The defendants alternatively argued that, even if the six-year statute of limitations under § 2415(a) applied, the government's action

3

was still barred because the complaint was filed more than six years after the cause of action accrued. The district court agreed with both arguments and granted the motions to dismiss. We affirm, concluding that under the applicable statutory provisions and federal regulations the government's action under the MSPA accrued on October 29, 2003, when the $275 million was transferred by the PCB producers to the PCB plaintiffs' lawyers. Accordingly, even if the longer six-year limitations period applies, the government's action was untimely.

**A**

Years after the PCB plaintiffs filed their personal injury lawsuits, the federal district court and the state circuit court hearing their claims held a joint session. At this proceeding, the parties resolved their disputes, and on September 9, 2003, entered into a $300 million settlement agreement.[2] By its terms, the agreement outlined a payment schedule whereby the PCB producers would first wire $75 million to an interest-bearing account. Within seven days of the state court's approval of the agreement, the PCB producers would wire another $200 million to the account. *See* Settlement Agreement at ¶ 3(e)-(g) [D.E. 1-1].

Under the terms of the settlement agreement, the PCB plaintiffs' lawyers were

---

[2] The settlement agreement involved 20,500 plaintiffs, including 17,000 plaintiffs in federal court and 3,500 plaintiffs in state court. *See* Transcript of Settlement Hearing Before Chief Judge Clemon, August 20, 2003 (attached as an exhibit to Pharmacia's Reply to the Motion to Dismiss) [D.E. 58-1].

given 90 days to diligently secure a liability release from each client. The PCB plaintiffs' lawyers were to hold the releases until at least 75% of the adult plaintiffs had released their claims, at which point the PCB plaintiffs' lawyers had to certify that the 75% threshold had been reached. Once they so certified, the PCB plaintiffs' lawyers would receive the $275 million.[3]

Thereafter, the PCB plaintiffs' lawyers were to certify to the state court when 97% of the PCB plaintiffs had signed releases, and at that point give the releases to the PCB producers. The PCB producers had three days to review the releases and raise any issues of concern. At "the end of this three day verification period or following the resolution [of any issues]" by the state court, if the PCB plaintiffs' lawyers "ha[d] obtained signed [r]eleases" from at least 97% of the PCB plaintiffs, the PCB plaintiffs' lawyers were required to "distribute the funds." *See* Settlement Agreement at ¶ 3(c).

The agreement had one more germane provision. If, after the 90-day period, fewer than 97% of the PCB plaintiffs had released their claims, the PCB producers, "at their sole discretion and election," could give "written notice to" the PCB plaintiffs' lawyers that the agreement was "null and void." *See id.* at ¶ 5(b). The

---

[3] The remaining $25 million was to be paid in annual installments of $2.5 million from 2004 to 2013. *See* Settlement Agreement at ¶ 1(c). The district court rejected the government's argument that as to the PCB plaintiffs' lawyers every annual $2.5 million payment restarted the limitations period as to that payment. The government does not press that argument on appeal, so we do not consider it.

5

PCB plaintiffs' lawyers would then have to return the $275 million. Otherwise, the PCB producers could choose to enforce the agreement as to those PCB plaintiffs who had signed and tendered their releases. The option given to the PCB producers was consistent with Alabama law, which provides that a breach of a condition subsequent merely renders a contract voidable. *See Sherill v. Sherill*, 99 So. 838, 839 (Ala. 1924); *Baskett Lumber & Mfg. Co. v. Gravlee*, 73 So. 291, 294-95 (Ala. Ct. App. 1916).

**B**

The state court approved the settlement on September 10, 2003. Once approved, the settlement was binding on the parties under Alabama law. *See Beverly v. Chandler*, 564 So. 2d 922, 923 (Ala. 1990). The events contemplated by the settlement agreement took place as follows:

- **August 20, 2003:** The parties agreed to a settlement.

- **August 26, 2003:** The PCB producers transferred $75 million to the interest-bearing account.

- **September 9, 2003:** The parties signed a written settlement agreement.

- **September 10, 2003:** The state court approved the settlement agreement.

- **September 17, 2003:** The PCB producers wired the additional $200 million to the interest-bearing account.

- **October 28, 2003:** The PCB lawyers certified that 75% of

6

the adult PCB plaintiffs had signed releases.

- **October 29, 2003:** The PCB producers paid $275 million to the PCB plaintiffs' lawyers.

- **December 2, 2003:** The PCB plaintiffs' lawyers certified that 97% of the PCB plaintiffs had signed releases.

On December 1, 2009, the government filed this lawsuit.

## C

The Medicare Secondary Payer Act, as its name implies, is related to the Medicare program, through which the government funds health insurance for certain qualifying individuals. Prior to the Act, Medicare paid for a qualifying individual's medical services without regard to whether they were also covered under a separate health plan or other insurance coverage. *See Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 414 (D.C. Cir. 1994). To promote the viability of the Medicare system and reduce expenditures, the Act introduced four features of relevance. *See id.* at 414–15 (discussing structure of the Act).

First, the Act generally "declares that, under certain conditions, Medicare will be the secondary rather than primary payer for" the medical bills of Medicare beneficiaries. *See United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 874–75 (11th Cir. 2003).

Second, in instances where the responsible, primary payer[4] "has not made or

cannot reasonably be expected to make payment . . . promptly," the Act allows Medicare to make a conditional payment for the beneficiary's medical services, i.e., a payment conditioned on reimbursement by the primary payer. *See* § 1395y(b)(2)(B)(i).

Third, the Act obligates a primary payer that is demonstrably responsible for those medical bills—or anyone who received payment from that primary payer—to reimburse the government for the amount Medicare conditionally paid. *See* § 1395y(b)(2)(B)(ii). A primary payer's responsibility for payment is demonstrated by "a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment" for medical-bill claims, "or by other means." *See id.*

Fourth, if the primary payer—or recipient of a payment from the primary payment—fails to reimburse the government despite its obligation to do so, the Act provides the government with two mechanisms through which to seek recovery: (i) the Act grants the government a right to subrogation,[5] to step in and assume the

_____

[4] A primary payer includes a group health plan, a worker's compensation law or plan, automobile or liability insurance policy (including a self-insured plan), or a no-fault insurance policy. *See* 42 U.S.C. § 1395y(b)(2)(A)(ii).

[5] The MSPA provides the government a subrogation right to obtain reimbursement of its conditional payments. 42 U.S.C. § 1395y(b)(2)(B)(iv). The government may even seek reimbursement from a third-party payer, even after that third-party has already made separate payment in settlement of claims with a Medicare beneficiary, if that third-party "is, or should be,

8

Medicare beneficiary's right for payment of medical bills that should have been paid by the primary payer. *See* § 1395y(b)(2)(B)(iv); (ii) the government is granted an independent cause of action to sue and assert its own claim against the primary payer and anybody who receives payment from the primary payer, including physicians, attorneys, medical providers, or Medicare beneficiaries themselves. *See* § 1395y(b)(2)(B)(iii); 42 C.F.R. § 411.24(g).

As with most complex concepts, a real-world example helps make the Act's contours more clear. Imagine a 65-year-old Medicare beneficiary who is injured when he slips on the wet floor of a supermarket and subsequently receives medical attention for his injuries. If the supermarket's negligence caused the man's injuries, the supermarket (or its liability insurance carrier) is ultimately responsible for his medical bills. But if the supermarket denies responsibility, litigation may be required to resolve the man's negligence claim, and he may not have the money to pay for his medical care in the meantime. Because this is a situation in which the supermarket cannot reasonably be expected to pay promptly, the Act allows Medicare to pay the man's medical bills on a conditional basis.

Now imagine that the man and the supermarket settle the negligence claim and that the supermarket's insurer pays the settlement funds to the man. To recoup

---

aware" of Medicare's conditional primary payment. *See* 42 C.F.R. § 411.24(i)(2).

the medical payments Medicare conditionally made, the Act allows the government to sue the insurer (which, because of the settlement, has been demonstrated to be the primary payer), the injured man (who is the recipient of a payment from the primary payment), or both of them. The government can, of course, recover only once, *see* 54 Fed. Reg. 41716, 41720 (Oct. 11, 1989) (the agency "will not pursue duplicate recoveries"), and if its recovery is against the insurer, the insurer can in turn sue the man to recover the payment it made to him, *see Shalala*, 23 F.3d at 418 n.4. *See also* 42 C.F.R. § 411.24(i)(1) ("If Medicare is not reimbursed as required . . . the primary payer must reimburse Medicare even though it has already reimbursed the beneficiary or other party.").

## D

On December 1, 2009—one day short of six years from the day that the PCB plaintiffs' lawyers filed the 97% certification and more than six years after the PCB producers paid the $275 million to the PCB plaintiffs' lawyers—the government sued the PCB producers, the PCB plaintiffs' lawyers, and the PCB producers' liability insurers.

The settlement agreement, the government alleged, demonstrated that the PCB producers and their insurers were responsible for the payment of the medical treatment needed by Medicare beneficiaries as a result of the PCBs produced in

10

Anniston. The government also alleged that Medicare had paid for the PCB-related medical treatment of 907 PCB plaintiffs. According to the government, because the PCB plaintiffs' lawyers had accepted payment from those responsible for payment of the medical services, they too were liable under the MSPA.

The PCB producers, their insurers, and the PCB plaintiffs' lawyers moved to dismiss the complaint. They argued that, under 28 U.S.C. § 2415, the government's suit was untimely. As noted earlier, the district court agreed and the government appealed.

## II

When it considers a motion to dismiss under Rule 12(b)(6), a district court accepts the factual allegations in the complaint as true and decides whether they raise a right to relief above the speculative level. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555-56 (2007). We undertake plenary review of the district court's decision, applying the same standard used below. *See Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1275 (11th Cir. 2012). A "dismissal on statute of limitations grounds is appropriate only if it is 'apparent from the face of the complaint' that the claim is time-barred." *La Grasta v. First Union Securities, Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (citation omitted).

## A

11

The purpose of a statute of limitations, such as 28 U.S.C. § 2415, "is to require the prompt presentation of claims." *Coppage v. U.S. Postal Serv.*, 281 F.3d 1200, 1206 (11th Cir. 2002) (internal quotation marks and citation omitted). Originally, there was no statute of limitations for lawsuits filed by the government. Congress, however, passed § 2415—a statute of limitations that applies to the United States —"to promote diligence by the government in bringing claims to trial and also to make the position of the government more nearly equal to that of a private litigant." *United States v. Kass*, 740 F.2d 1493, 1496 (11th Cir. 1984).

As relevant here and as noted above, § 2415 contains two time limits. The government has six years "after the right of action accrues" to bring an action "founded upon any contract express or implied in law or fact." *See* § 2415(a). It has three years after the action accrues to bring an action "founded upon a tort." *See* § 2415(b).

The government characterizes its MSPA claim as an action founded upon a contract implied in law. If this characterization is correct, the government would have had six years from the date of accrual to bring this action. And, so long as the government's claim accrued when the PCB plaintiffs' lawyers certified that 97% of the PCB plaintiffs had released their claims, the government's lawsuit would be timely. The defendants contend, however, that the claim is really an action founded

12

upon a tort, giving the government only three years from accrual to sue.

We need not, and do not, decide whether the government's attempt to recoup Medicare payments under the MSPA after a toxic-tort settlement constitutes an action founded upon a contract or an action founded upon a tort.[6] Assuming that § 2415(a)'s six-year limitations period applies, the government's action under the MSPA against the PCB producers, their insurers, and the PCB plaintiffs' lawyers accrued on October 29, 2003, when the PCB producers transferred $275 million from an interest-bearing account to the PCB plaintiffs' lawyers. Because the government filed this lawsuit on December 1, 2009—six years, one month, and two days from when its action accrued—its lawsuit is untimely.[7]

**B**

The accrual of a federal cause of action is a matter of federal law. *See Wallace v. Kato*, 549 U.S. 384, 388 (2007); *Mendiola v. United States*, 401 F.2d 695, 697 (5th Cir. 1968). The general rule is that a federal cause of action "accrues once a plaintiff

---

[6] Recently signed legislation, although not applicable in this case, clarifies the uncertainty concerning statute of limitations issues for MSPA reimbursement claims. The Strengthening Medicare and Repaying Taxpayers Act establishes a three-year statute of limitations for Medicare to file suit for recovery under the MSPA. *See* Pub. L. No. 112-242, § 205(a) (2013). A claim by the government must be "filed not later than 3 years after the date of the receipt of notice of a settlement, judgment, award, or other payment made pursuant to paragraph (8) relating to such payment owed." *Id.*

[7] The government never sued any of the PCB plaintiffs on whose behalf it had made conditional Medicare payments. We therefore express no view on when the government's MSPA cause of action against such PCB plaintiffs would have accrued.

13

has a 'complete and present cause of action.'" *Merk & Co., Inc. v. Reynolds*, 130 S. Ct. 1784, 1793 (2010) (citation omitted). "Unless Congress has told us otherwise in the legislation at issue, a cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief." *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.,* 522 U.S. 192, 201 (1997). As we explain below, Congress and the Secretary of Health and Human Services—who has the authority to "promulgate regulations to carry out" the MSPA, *see* 42 U.S.C. § 1395y(o)(3)[8]—have told us that the government can file suit under the Act against non-beneficiaries before settlement proceeds are irrevocably transferred to Medicare beneficiaries.

## 1

The MSPA allows the government to "bring an action against any and all entities that are or were required or responsible . . . to make payment [for expenses conditionally paid by Medicare] . . . under a primary plan." 42 U.S.C. § 1395y(b)(2)(B)(iii). An entity which "engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by

---

[8] Subsection (o) was not added to the Act until 2010. *See* Pub. L. No. 111-148 at 760 (March 23, 2010). But there is no doubt about the Secretary's authority to prescribe regulations. For example, § 1395hh, enacted in 1965, provides that "[t]he Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter." 42 U.S.C. § 1395hh(a)(1). *See also* 42 U.S.C. § 1395ii, Pub. L. No. 103-296, § 108(c)(4) (1994); *Baxter Int'l*, 345 F.3d at 887 ("HHS . . . was expressly delegated by Congress to formulate rules implementing the MSP statute").

14

failure to obtain insurance, or otherwise) in whole or in part." § 1395y(b)(2)(A)(ii). Although the MSPA itself does not expressly speak to when the government's cause of action accrues against non-beneficiaries, several of its accompanying regulations give us some guidance.

In relevant part, 42 C.F.R. § 411.24(e) gives the government "a direct right of action to recover from any primary payer," defined for our purposes as "any entity that is or was required or responsible to make payment with respect to an item or service (or any portion thereof) under a primary plan." 42 C.F.R. § 411.21. The government also has a "right of action to recover its payments from any entity, including a beneficiary, provider, supplier, physician, attorney, State agency or private insurer that has received a primary payment." 42 C.F.R. § 411.24(g).

Pursuant to § 1395y(b)(2)(B)(ii) of the Act, a "primary plan's responsibility for . . . payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) . . . or by other means." Because the PCB plaintiffs did not obtain a judgment against the PCB producers or their insurers, the government and the defendants focus on the "payment conditioned upon . . . release" language in § 1395y(b)(2)(B)(ii). According to the defendants, when the PCB producers paid hundreds of millions of dollars on the condition that the PCB

15

plaintiffs release their tort claims, the PCB producers made a "payment conditioned upon . . . release" as required by the MSPA. The government, not surprisingly, disagrees. It argues that this statutory language requires a final, enforceable settlement agreement. Because the PCB producers had the unilateral right to void the settlement agreement until 97% of the PCB plaintiffs released their claims, the government argues, a final release did not take place until December 2, 2003, when the PCB producers could no longer void the agreement, and it is only on that date that the government's action under the MSPA accrued.[9]

In our view, both interpretations of the conditioned-upon-release language in § 1395y(b)(2)(B)(ii) are plausible. The phrase "conditioned upon" can reasonably refer to the actual execution of a release and a finalized settlement agreement (i.e., a contract that is enforceable only when the plaintiff irrevocably releases his claim in exchange for money), as the government urges, or to the anticipated future execution of a release pursuant to a fully signed settlement agreement (i.e., a promise enforceable on the completion of a condition subsequent), as the defendants say. *See*

---

[9] At the hearing on a motion for reconsideration before the district court, the government argued that a critical issue with respect to the accrual of its claim and the tolling of the statute of limitations was when the government knew or should have known that the defendant tortfeasors first demonstrated responsibility for reimbursing Medicare. *See* Transcript of Hearing [D.E. 149] at 90-91 (Govt.'s counsel: "In terms of what we have given you in writing, we have not submitted any factual statements . . . . You can't infer from silence that we had knowledge prior to December 2003."). However, the government has chosen not to raise this issue on appeal and we therefore express no opinion on whether notice might affect the accrual of the government's claim under the MSPA.

16

1 SHORTER OXFORD ENGLISH DICTIONARY 480 (5th ed. 2002) (defining "conditioned" as "subject to conditions or limitations; dependent on a condition; not absolute or infinite"); BLACK'S LAW DICTIONARY 333 (9th ed. 2009) (defining "condition" as a "future and uncertain event on which the existence or extent of an obligation or liability depends").

The Secretary of Health and Human Services has issued a regulation, 42 C.F.R. § 411.22(b), which interprets § 1395y(b)(2)(B)(ii) and provides as follows:

> A primary payer's responsibility for payment may be demonstrated by—
>
> (1) A judgment;
>
> (2) A payment conditioned upon the beneficiary's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary payer or the primary payer's insured; or
>
> (3) By other means, including but not limited to a settlement, award, or contractual obligation.

We defer to this regulation if the statute it interprets is ambiguous or silent with respect to the specific issue, and if the Secretary's interpretation is a permissible construction of the statute. *See Gulfcoast Med. Supply, Inc. v. Sec'y, Dep't of HHS*, 468 F.3d 1347, 1351 (11th Cir. 2006) (per curiam). As a general matter, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer . . . ." *Chevron U.S.A., Inc. v.*

17

*Natural Res. Def. Council*, 467 U.S. 837, 844 (1984).

As we have noted, the relevant statutory language here is ambiguous. Both parties offer reasonable readings of the phrase "conditioned upon . . . release." And though § 1395y(b)(2)(B)(ii) also states that "other means" may demonstrate that a person or entity is responsible for medical payments conditionally made by Medicare, those words are about as open-ended as language gets. Because the statutory language is unclear, and because 42 C.F.R. § 411.22(b) is a reasonable construction of that language, we defer to the Secretary's regulation, as other courts have done. *See, e.g., Bio-Medical Applications of Tenn., Inc. v. Cent. States Se. and Sw. Areas Health and Welfare Fund*, 656 F.3d 277, 291 (6th Cir. 2011) (concluding that "other means" language in § 1395y(b)(2)(B)(ii) is ambiguous and according *Chevron* deference to 42 C.F.R. § 411.22(b)(3) as a reasonable regulation); *Mason v. Sebelius*, No. 11-2370 (JBS/KMW), 2012 WL 1019131, at *14 (D.N.J. Mar. 23, 2012) (giving *Chevron* deference to 42 C.F.R. § 411.22(b)(2)); *Nat'l Comm. to Preserve Social Security and Medicare v. Phillip Morris USA Inc.*, 601 F. Supp. 2d 505, 510 n.4 (E.D.N.Y. 2009) (indicating that 42 C.F.R. § 411.22 is entitled to deference), *vacated on other grounds,* 395 F. App'x 772, 2010 WL 3933494 (2nd Cir. 2010).

In our opinion, 42 C.F.R. § 411.22(b)(3)—a version of which has been in

18

effect since 2006—undermines the government's accrual argument. The regulation provides, much like the statute, that responsibility for payment may be demonstrated by a judgment, payment conditioned upon release, or "other means." *Id.* at § 411.22(b). The regulation defines "other means" as including but not limited to—a "settlement" or "contractual obligation." *Id.* at § 411.22(b)(3). If that is so, then the payment-conditioned-upon-release language in § 1395y(b)(2)(B)(ii) cannot mean *only* a settlement or contractual obligation because every word in a statute or regulation must be given meaning, and laws generally lack (or are interpreted not to have) surplus language. *See Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment CSX Transp. N. Lines v. CSX Transp., Inc.*, 522 F.3d 1190, 1195 (11th Cir. 2008) ("courts must reject statutory interpretations that would render portions of a statute surplusage"); *United States v. Hassanzadeh*, 271 F.3d 574, 582 (4th Cir. 2001) ("We construe a statute or regulation 'so that, when possible, no part . . . is superfluous.'"). The government's construction would render the statutory payment-conditioned-upon-release language meaningless, for the "other means" language (as interpreted in the regulation) would incorporate it wholesale. Guided by 42 C.F.R. § 411.22(b), we therefore interpret the statutory phrase "payment conditioned upon . . . release" to include a payment made to a Medicare beneficiary (or his agent) that is conditioned upon the beneficiary releasing his claim at some

19

point in the future, even though a settlement has not been fully concluded.

The language of the statute bolsters this outcome. The statutory phrase "payment conditioned upon . . . release" assumes that a payment may be revoked unless the "condition" of valid releases being provided has been satisfied. The statute does not use the language "payment in exchange for release" which would support a contrary argument that the releases must be effective prior to the payment. Nor does the statute express any dispositive aspect as to whom payment is made or whether payment must be released directly to beneficiaries—only that payment has been conditioned upon a release. *Cf.* 17A Corpus Juris Secundum, Contracts, § 451 (updated June 2013) ("A condition subsequent presumes a valid contract and refers to a future event."). *See also* Settlement Agreement at ¶ 3(a) ("Each plaintiff . . . *as a condition of receiving any payment* to or on behalf of such plaintiff . . . shall be required to sign a general *release* of all claims") (emphasis added).

Applying our interpretation of § 1395y(b)(2)(B)(ii) to the allegations in the complaint, we conclude that the government's cause of action under the MSPA accrued on October 29, 2003, when the PCB producers and their insurers transferred $275 million to the PCB plaintiffs' lawyers. The PCB plaintiffs' lawyers who received those funds were agents of the PCB plaintiffs and held the money on their clients' behalf, so the transfer was in effect a payment to the PCB plaintiffs, and

20

under the settlement agreement's terms, the ultimate payment to the PCB plaintiffs was conditioned on the PCB plaintiffs signing releases in favor of the PCB producers. Indeed, in its complaint the government itself alleged that the "*terms* of the Abernathy Settlement rendered these defendants [Monsanto, Solutia, and Pharmacia] required or responsible to pay under a primary plan." Compl. ¶ 47 (emphasis added); *id.* at ¶ 42. Thus, pursuant to the terms of the Settlement Agreement and the government's own allegations, the limitations period began to run no later than when the defendants made the $275 payment under the Settlement Agreement, at the *latest*, and the government's complaint filed more than six years after that date is time-barred.

In its briefs, the government essentially ignores 42 C.F.R. § 411.22(b), and never explains why we should not defer to that regulation in deciding when an MSPA claim of this type accrues under 42 U.S.C. § 1395y(b)(2)(B)(ii). The government does assert that our interpretation cannot possibly be the law, for it would mean that the PCB producers could "void" the settlement agreement after a lawsuit was instituted. But the Secretary is entitled to make reasonable policy choices, and may believe it best for Medicare (and for the federal treasury) if the government intervenes or sues for reimbursement under the Act as quickly as possible. *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S.

21

967, 997 (2005) (upholding FCC regulation because "construction [of ambiguous statute] was 'a reasonable policy choice for the [Commission] to make'") (citation omitted). Such promptness, for example, may ensure that settlement proceeds do not evaporate.[10] Time may be of the essence, and the Secretary is surely free to balance the risk of losing money transferred through a settlement with the possible inefficiency of suing sooner rather than later. But in the end, our decision does not depend on our agreement with the Secretary's policy decisions; even if we thought that the Secretary's regulation was "not . . . the only possible interpretation or even the one a court might think best," we would still be required to defer to it. *See Holder v. Martinez Gutierrez*, 132 S. Ct. 2011, 2017 (2012).

The government also argues that the cause of action could not have accrued before December 2, 2003—when the PCB plaintiffs' lawyers certified that 97% of the PCB plaintiffs had signed releases—because the defendants did not know which plaintiffs would elect to settle their claims. We are not persuaded. First, this argument fails to materially advance the government's position; the government's lack of certainty does nothing to change our interpretation of the payment-conditioned-upon-release language in § 1395y(b)(2)(B)(ii) as interpreted by 42 C.F.R. § 411.22(b). Second, the government acknowledges that even if the

---

[10] In toxic-tort litigation, large corporations sometimes go bankrupt. *See, e.g., In re Dow Corning Corp.,* 250 B.R. 298, 307-08 (Bankr. E.D. Mich. 2000). Something similar, in fact, seems to have happened to Solutia. *See* Compl. at ¶ 28.

22

PCB plaintiffs' lawyers had failed to obtain releases from 97% of the plaintiffs, "[a]lternatively, at their option, [the defendants] could choose to enforce the agreement as to the plaintiffs who had signed releases." Brief for United States at 7. Thus, this is not a case where the defendants had to do anything to keep the settlement enforceable. Under Alabama law, as noted earlier, the non-occurrence of a condition subsequent only made the settlement voidable, and if the defendants did nothing, the settlement would remain in place notwithstanding the failure to meet the 97% release target. *See* Settlement Agreement at ¶ 5(b) ("If the [defendants] do not give such written notice [that the settlement agreement is null and void], plaintiffs' counsel shall distribute the funds").

The confirmation by the PCB plaintiffs' lawyers that they had obtained 97% of releases was significant in a contractual sense because it ensured that the defendants would not be able to void the settlement agreement, but it did not give the government any more information about the existence of a claim under the MSPA than when those lawyers confirmed on October 28, 2003, that 75% of the releases had been obtained. The 97% certification was not a prerequisite for accrual of the government's MSPA claim; the significant event occurred when the PCB producers made a payment of $275 million to the PCB plaintiffs' lawyers, conditioned upon releases by the PCB plaintiffs.

**2**

Additionally, the government's argument that our affirmance will require the filing of premature lawsuits is also undercut by another of the Secretary's regulations, which provides that the government "may initiate recovery as soon as it learns that payment has been made or *could be made* under workers' compensation, any liability or no-fault insurance, or an employer group health plan." 42 C.F.R. § 411.24(b) (emphasis added). On October 29, 2003, the $275 million payment "ha[d] been made" and the settlement agreement mandated that ten more annual payments of $2.5 million "could be made." *See* Settlement Agreement at ¶ 1(c) (requiring annual payments from 2004 to 2013). And even if the $275 million was considered a contingent transfer at the time, those funds constituted a payment that "could be made." Thus, the government need not wait to file suit until a payment for medical bills has been made by a responsible entity; it is sufficient for the government to learn that payment "could be made" by a responsible entity.

The import of these regulatory provisions, § 411.22(b) and § 411.24(b) —which have not been challenged here—is that the government was able to file suit under the MSPA against the defendants once the PCB producers and their insurers transferred $275 million to the PCB plaintiffs' lawyers. At that point it became clear,

24

in the words of 42 U.S.C. § 1395y(b)(2)(B)(iii), that—according to the government's MSPA theory of recovery—the PCB producers and their insurers were "required or responsible . . . to make payment" for expenses conditionally paid by Medicare, and that the PCB plaintiffs' lawyers had, in the words of 42 C.F.R. § 411.24(g), "received a primary payment." *Cf. Glover v. Liggett Grp.*, 459 F.3d 1304, 1309 (11th Cir. 2006) (per curiam) ("[W]e conclude that an alleged torfeasor's responsibility for payment of a Medicare beneficiary's medical costs must be demonstrated *before* an [MSPA] private cause of action for failure to reimburse Medicare can correctly be brought . . . ."); *United States v. Hughes House Nursing Home, Inc.*, 710 F.2d 891, 894 (1st Cir. 1983) ("the government's cause of action [to recover Medicare overpayments] accrued when, under its regulations, it became entitled to demand its money back from the [nursing home]").

The government's cause of action under the MSPA against the PCB producers, their insurers, and the PCB plaintiffs' lawyers accrued on October 29, 2003, so the government had until October 29, 2009 to bring this lawsuit, even if the longer six-year statute of limitations applied pursuant to 28 U.S.C. § 2415(a). Because the government brought this lawsuit on December 2, 2009, the action is time-barred.

**III**

25

The district court's dismissal of the government's complaint as untimely is affirmed.

**AFFIRMED.**